IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 7, 2006 Session

## STATE OF TENNESSEE v. TYREE ROBINSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-13118     Joseph B. Dailey, Judge**

---

**No. W2004-02555-CCA-R3-CD  - Filed November 17, 2006**

---

The appellant, Tyree Robinson, was convicted by a jury in the Shelby County Criminal Court of premeditated murder, felony murder, and especially aggravated robbery.  The appellant received a total effective sentence of life without the possibility of parole plus twenty years.  On appeal, the appellant argues that the evidence is insufficient to support his convictions; the trial court erred in failing to instruct the jury that Brown, Morris, and Courtney Perry were accomplices as a matter of law; the trial court abused its discretion in allowing hearsay statements; and the trial court erred in responding to a jury question.  Upon review of the record and the parties' briefs, we reverse the judgments of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Reversed;**
**Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, J., joined. GARY R. WADE, P.J., not participating.

Charles W. Gilchrist, Jr., and Lance Chism, Memphis, Tennessee, for the appellant, Tyree Robinson.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Theresa McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On the morning of April 10, 2001, the body of the victim, O'Neal Cornish, was discovered in the Whitehaven section of Memphis.  Percy McCray Alexander, a retired battalion chief with the Memphis Police Department, testified at the appellant's trial that at approximately 6:45 a.m., he was driving around his neighborhood searching for his lost dog.  Alexander drove down Kilarney Avenue near an area where "people had often went through . . . and dumped stuff."  Alexander testified that

he looked down the cove and saw a pair of tennis shoes in an odd position, leading him to believe that a homeless or drunk person had passed out. Alexander decided to take a closer look and drove down the cove, blowing the horn of his vehicle. When he realized that there was indeed a man lying in the area, Alexander got out of his vehicle and shouted to see if he could rouse the man. Alexander said that the person was lying on his back with one leg bent behind the other. He observed a quarter-sized wound in the side of the man's head, with blood coming from it. Alexander called police, reported that he had found a dead body, and stayed with the body until police arrived.

Sergeant Eric Freeman, a crime scene investigator with the Memphis Police Department, testified at trial that at approximately 8:25 a.m. on April 10, 2001, he was called to a "DOA unknown" crime scene near Shepherd's Tree Street and Kilarney Avenue. He stated that the area was being developed for houses but had been used as a dumping ground.

Sergeant Freeman and another crime scene investigator discovered four .380 caliber shell casings on the ground above the victim's head. They also discovered several shell casings that appeared to have been there for some time. Near the body, police found tobacco from a broken cigar or cigarette, bloody tissue paper, a sales receipt, a bullet fragment, a tile cutting wheel, and a Waffle House identification card bearing the name "Jennifer." Twenty-five dollars in cash was found in the victim's right sock. Sergeant Freeman stated that nothing at the scene could be dusted for fingerprints.

Seku Teamer testified at trial that he was the best friend of the victim, O'Neal Cornish. At the time of the victim's death, Teamer was living with the victim, the victim's mother, the victim's older brother, and two other friends. Around 9:00 p.m. on April 9, 2001, the victim and Teamer went to Wing City, a nightclub and restaurant that served as a "hang out spot." The victim drove Teamer to Wing City in the victim's green Blazer which had unique, expensive rims. The men stayed at the nightclub and talked until around 2:00 a.m. Fifteen minutes before they left, the victim received a call on his cellular telephone. Teamer heard a male voice on the other end of the conversation, but he could not identify the voice. The victim told Teamer that he was speaking with the appellant. Teamer said that "[t]hey were talking about getting a hotel room and having intercourse with a young lady [named Kisha]." Teamer testified that the victim and the appellant made arrangements to meet at the Loft Apartments where the appellant lived. The victim drove Teamer home, and, at 2:30 a.m., the victim left for the Loft Apartments to pick up the appellant and Kisha.

Lieutenant Vennes Owens with the Memphis Police Department testified that he was assisting in the victim's case on April 28, 2001, when a suspect, Ilyas Morris, was brought in for questioning. After the questioning, Morris led Lieutenant Owens to an area near Coro Lake and Robco Lake to help locate the pistols that had been used in the murder.[1] Divers searched Robco Lake and found the pistols. Morris also led Lieutenant Owens and Lieutenant Anthony Craig to an

---

[1] The names of these lakes are used somewhat interchangeably in the record.

area near the Loft Apartments where police found a plastic milk jug which had been used to carry gasoline.

Lieutenant Reginald Morgan with the Memphis Police Department testified that he was the lead investigator in the case. On April 18, 2001, Lieutenant Morgan accompanied Sergeant Jones to the Club on the Green Apartments where the victim's vehicle was found. The vehicle had been burned from the inside out. On October 4, 2001, Lieutenant Morgan retrieved a "bullet pack" from the morgue containing five bullets which had been retrieved from the victim's body. He then took the bullets and the pistols recovered from the lake to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing.

Three people who were present during or immediately after the victim's murder testified at trial on behalf of the State. The first such witness, Takisha Brown,[2] testified that at the time of the victim's death, she was dating Corey Perry. At that time, Corey was living with his brother, Courtney Perry; Ilyas Morris; Miko Saulsberry; and others in the appellant's apartment at the Loft Apartments.[3] Brown testified that earlier in the evening of April 9, 2001, she was out with friends. At approximately midnight she returned to the appellant's apartment. The appellant, Morris, Saulsberry, and the Perry brothers were there.

Brown went into the appellant's bedroom to speak with him and Courtney Perry. When Brown entered the room, the appellant was talking with Courtney about the victim. The appellant told Brown that the victim was coming to the apartment to pick him up and that he wanted her to go along with what he had already discussed with the victim. Specifically, Brown said that the appellant wanted her to tell the victim that she would have sexual intercourse with him. Brown said that the appellant wanted her to agree to have sex with the victim so that the appellant could rob him. Brown spoke briefly with the victim on the telephone and told him that she would go with him and the appellant. She explained that she was the "bait" to entice the victim to come to the apartment. Brown testified that the victim was also promised that they would "[s]moke weed." Brown believed that the appellant wanted to rob the victim because he needed money to pay the rent and avoid eviction from the apartment.

When the victim arrived, Brown, the appellant, and Courtney Perry got into the victim's dark green truck. The victim was driving, Courtney was in the front passenger seat, the appellant was sitting behind the victim, and Brown was sitting behind Courtney. The victim drove to a gas station to buy cigars so they could smoke marijuana. On the way, the appellant and the victim talked about "[s]omething that had happened earlier [the victim] was involved in and this guy named Johnny."

---

[2] Brown is sometimes referred to as "Kisha" in the record.

[3] Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

After getting the cigars, the victim drove to an area in Whitehaven that "looked like a street that wasn't finished – like they hadn't finished building houses over there." After they smoked the marijuana, the victim pulled out a pistol. Brown stated that the victim mentioned that the area was dark and "how anything can happen." Brown said that the victim did not point the pistol at anyone. The victim asked the appellant if he had a gun. The appellant denied having a gun but then admitted that he was "just playing" and pulled out a gun. Brown turned her head toward the window, then heard a noise that sounded like a pop gun. Out of the corner of her eye, she saw sparks "like a camera flash." Immediately afterward, she saw blood coming from the back of the victim's head. The appellant got out of the vehicle, opened the driver's door, and the victim fell out of the vehicle. The appellant shot the victim again. Afterward, he picked up the victim's pistol, got into the driver's seat, and drove the group to the Club on the Green Apartments.

When they arrived at the Club on the Green Apartments, Morris and Saulsberry were waiting for them in Morris' Astro van. At the appellant's instruction, Brown and Courtney got out of the victim's vehicle, Brown got into Morris' van, and the four men put on plastic gloves and went through the victim's vehicle. At some point, the appellant removed his clothes, which were covered with blood. After fifteen or twenty minutes, they left in Morris' van. The appellant told Morris to drive to the location of the victim's body. When they arrived at the body, the appellant leaned out of the van, intending to shoot the victim again to ensure that he was dead. However, the appellant's pistol jammed, and he told Courtney to shoot the victim with the victim's pistol. Brown said that Courtney was hesitant, but he shot the victim two or three times. Afterward, they went back to the Loft Apartments.

After returning to the apartment, the appellant changed clothes and left the apartment with Saulsberry, Morris, and Courtney. Brown stayed at the apartment with Corey Perry. Brown believed the men were going to return to the victim's Blazer. As the men were leaving, Brown heard them talking about stopping at a gas station. Later, when the men returned, Brown heard Saulsberry screaming that he had been burned. He refused to go to a hospital and eventually called the mother of his child and talked with her about the burns.

Brown admitted that she had been arrested and charged with facilitation of first degree murder due to her role in the victim's death. She said that she had not entered into any deal with the State and that she had been instructed by the State only to tell the truth. Brown testified that Courtney Perry was in jail for his complicity in the crime.

Ilyas Morris testified that in April 2001, he was living at the appellant's apartment. He stated that numerous people lived in the apartment, including the appellant, Courtney Perry, Saulsberry, Tanner Scott, and Willie Rosser. Morris said that there were frequently visitors in the apartment, many of whom were in a dance group managed by the appellant. At the time, Morris had a 1991 Chevrolet Astro van.

Early in the morning of April 9, 2001, Morris was in the apartment listening to music. The appellant and Courtney were talking on the porch. The appellant asked Morris to come out to the

porch. The appellant and Courtney were talking about robbing someone. The appellant asked Morris to drop them off. They did not give Morris any additional details, explaining, "The less you know, the better[] you are."

Later that night, around midnight, Morris was downstairs trying to sleep, and he heard the appellant, Courtney, and Brown talking in the appellant's room upstairs. Morris went to sleep and was awakened some time later by Saulsberry. Saulsberry told Morris that the appellant wanted them to go to the Club on the Green Apartments. Morris said that he did not know why they were going to the apartments. Morris knew that the appellant's friend David lived there, and he thought they were going to David's apartment.

Morris drove Saulsberry to the Club on the Green Apartments. When they got there, they waited outside for "a good little while." At some point, they decided to leave. As they were leaving, Morris saw a vehicle coming down the street with its lights flashing. Morris slowed down and saw that the appellant was driving the vehicle, a green Blazer. When the appellant flashed the lights, Morris turned around and drove back into the apartments, got out of the van, and looked around to see whose vehicle it was. The appellant got out of the vehicle, removed his clothes, and got into Morris' van. Courtney Perry and Brown were in the Blazer with the appellant. Morris went over to the Blazer and saw blood all over the driver's seat. Morris was curious about the blood, but he did not ask any questions. Morris also saw a VCR in the Blazer. He took the VCR from the Blazer and put it in his van. Morris said he took the VCR because he wanted it.

Saulsberry, the appellant, Courtney, and Brown got into Morris' van and Morris drove them back to the Loft Apartments. During the drive, Courtney and the appellant laughed about the sound the victim had made when he was shot. They left Brown at the apartment and then called around looking for a floor jack "to take the guy's rims off." Despite their efforts, they were unable to find a floor jack.

At some point, Morris, the appellant, Courtney, and Saulsberry went back to Kilarney Avenue and Shepherd's Tree Street because the appellant wanted to make sure "the guy" was dead. Morris drove, and the appellant gave him directions. When they got to the location of the victim's body, the appellant told Courtney to get out of the van and shoot the victim again. Courtney complied, shooting the victim two to four times.

Morris testified that he had known the appellant for approximately two months at the time of the offenses. He knew that the appellant had a .380 chrome pistol that did not have a safety on it. Courtney used another .380 pistol to shoot the victim. The pistol used by Courtney was smaller than the appellant's pistol. Afterward, they bought some gasoline to burn the Blazer. They put the gasoline in a "jungle juice" jug and a Sprite bottle. They returned to the Blazer and poured the gasoline on the Blazer. Saulsberry was burned while attempting to ignite the gasoline. After burning the Blazer, they went back to the Loft Apartments, and Saulsberry took a bath. The next morning, Saulsberry called his girlfriend, and she came to meet him. Later that day, Saulsberry went to the hospital for treatment of the burns. Following Saulsberry's hospital visit, the police questioned the

appellant and Courtney about Saulsberry's burns. Thereafter, the appellant asked Morris to help him get rid of the guns. Morris took the appellant and Courtney to Coro Lake, and they threw the guns into the lake. Morris testifed that he did not call the police because he was scared. After Morris was taken into custody, he showed police where the guns were thrown and the field where the jug was thrown.

Morris acknowledged that no promises had been made to him for his testimony and that he had been asked by the State only to tell the truth. Morris admitted that he had been charged as an accessory after the fact to murder because he helped to dispose of the evidence and stole the VCR.

On cross-examination, Morris denied that he knew the appellant planned to rob the victim and again asserted that he thought the appellant was going to the Club on the Green Apartments to visit the appellant's friend, David. Morris was questioned extensively regarding a statement he gave to police on April 26, 2001. Morris admitted that he did not tell police that he thought the appellant was going to visit his friend, David Stephens. He admitted that he told police that the appellant said "he was going to call O'Neal and tell him he knew a girl that wanted to f[—]." In his statement, Morris told police that he did not hear the conversation, but "the plan was the same."

On redirect, Morris said that he was not present when the victim was shot. He knew about the murder because the appellant told Morris that he shot the victim, and he saw blood in the Blazer. He told police that the appellant killed the victim for money. Morris was asked to read from other portions of his statement. Morris asserted in his statement that the appellant asked him to drop the appellant off somewhere so he could rob "this fellow." Morris was to meet the appellant at the Club on the Green Apartments. Morris told police that the "[f]irst time he was going to rob this fellow in Loft Apartments." They drove around, but the plan was not successful. The appellant saw someone he wanted to rob at a car wash, but the man got into his car and left.

Morris admitted that in his statement he said the victim came to the apartment to pick up the appellant at approximately 4:00 a.m. on April 10, 2001. The appellant, Brown, and Courtney went outside to meet the victim. The appellant came back in and told Morris to meet him at the Club on the Green Apartments. Morris and Saulsberry drove to the Club on the Green Apartments to wait on the appellant. The remainder of Morris' statement was similar to his testimony on direct examination. Morris said that he agreed to give his statement, and he responded affirmatively when asked, "Is this what happened that night?" When asked why he told the jury that he went to the Club on the Green Apartments to meet someone, he said that "he really couldn't remember."

Courtney Perry testified that at the time of the murder, he and the appellant were renting an apartment together in the Loft Apartments. Courtney stated that several people, including his brother Corey, frequently stayed at the apartment. On April 9, 2001, the appellant came into Courtney's bedroom, saying that he needed money to pay the rent and that he was going to ask the victim for the money. In a statement to police, Courtney maintained that the appellant said, "Like we gonna take him to a motel, and I'm going to just do him in." When Courtney asked the appellant why they

were going to a motel, the appellant explained his plan to entice the victim with the promise of having sex with Brown.

Later that night, the victim drove a green Blazer to the appellant's apartment. The victim drove the appellant, Courtney, and Brown from the apartment to a convenience store to get cigars to smoke marijuana. The appellant sat behind the victim as he drove, Courtney sat in the front passenger seat, and Brown sat behind him. After buying cigars, the group went to a place near Shepherd's Tree Street and Kilarney Avenue to smoke marijuana. They were laughing and talking, and the appellant was playing with a pistol. Courtney heard a gunshot and jumped out of the vehicle. After getting some distance from the vehicle, Courtney turned around and noticed a stream of blood coming from the back of the victim's head. Following a second shot, the appellant removed the victim from the vehicle. The appellant got into the driver's seat, and Brown got into the front passenger seat. Courtney returned to the vehicle and called the victim's name. Upon receiving no response, Courtney got back into the vehicle because he was scared.

The appellant drove them to the Club on the Green Apartments. When they arrived, Morris, who was with Saulsberry, pulled his van in behind them. The appellant, Brown, and Courtney got out of the Blazer. Once out of the Blazer, the appellant took off his clothes and got into Morris' van. Morris got out of the van and took something from the Blazer. The appellant, Morris, Brown, Saulsberry, and Courtney got into the van, and Morris drove back to the body. The appellant told Courtney to get out and shoot the victim. Courtney complied, using a pistol that was smaller than the appellant's. Courtney knew that the victim was already dead.

Afterward, they went to a gas station because the appellant wanted to buy some gasoline. They returned to the Blazer, and Saulsberry was badly burned while igniting gasoline they had poured on the Blazer. They all returned to the appellant's apartment, and, eventually, Saulsberry went to the hospital for treatment. After Saulsberry's hospital visit, police came to speak to the appellant and Courtney. Later, the appellant had Morris drive him and Courtney to Coro Lake to dispose of both pistols.

Courtney admitted that he had been convicted of first degree murder and especially aggravated robbery for his participation in the crimes.

Dr. O'Brian Cleary Smith, the Shelby County Medical Examiner, testified that he performed the autopsy on the victim. He determined that the victim died as the result of multiple gunshot wounds. The victim had five entrance wounds on his body and one exit wound. He identified the wounds as A, B, C, D, and E. Gunshot wounds A and B were contact wounds to the victim's head. The bullets traveled from the right side of the victim's head through the brain and rested near his left jaw. Bleeding in the path of gunshot wounds A and B indicated that the victim was alive when those wounds were inflicted. Gunshot wounds C and D passed through the victim's chest and were found in his spinal cord. The bullet for gunshot wound E exited the body and was not recovered. Dr. Smith stated that gunshot wounds C, D, and E had no blood in the wound path, indicating that the victim was dead when those wounds were inflicted.

Don Carman, a forensic scientist with the firearms identification unit of the TBI crime laboratory, testified that he received the two .380 caliber pistols that police found in Robco Lake, the five bullets retrieved from the victim's body, and the eight cartridge casings found at the scene of the crime. One of the pistols was a Lorson .380 caliber semi-automatic which was missing the left thumb safety, and the other was a Davis .380 caliber automatic. The Lorson was larger than the Davis. Carman testified that when he received the pistols, the barrels and chambers were impacted with mud and rust, and the pistols were inoperable. Carman cleaned the pistols and performed tests on them and on the bullets and cartridges.

Carman determined that bullets A and B had been fired from the same pistol.[4] He stated that the bullets demonstrated the same class characteristics as a bullet fired from the Lorson pistol, but he could not make a one hundred percent positive identification. Carman determined that bullets C and D were fired from the same pistol, a pistol with Davis characteristics, but, again, he was unable to make a conclusive identification. Carman said that the fifth bullet was a .380 caliber; however, the bullet was too mutilated for a comparison to be conducted. Carman said that two of the cartridges were similar to each other and to the class characteristics of the Davis pistol. Two other cartridges were similar to each other and similar to characteristics of the Davis. The remaining four cartridges were similar to each other, but Carman could not determine the origin of those cartridges. Carman explained that the mud and rust in the pistols contributed to the difficulty in establishing a conclusive match between the pistols and the bullets or cartridges.

Aldith Cornish, the mother of the victim, testified that her son was seventeen years old at the time of his death. She saw the victim at 6:30 p.m. on April 9, 2001. He had a green Blazer that Cornish had provided for him. The Blazer had special rims on it.

The appellant testified as the sole witness in his defense. The appellant said that in April 2001, he shared an apartment with Courtney Perry, and other people frequently stayed there. Some of the people, namely members of a dance troupe he promoted, were invited by the appellant. However, because Morris would not contribute to the bills, the appellant was unhappy with Courtney for allowing Morris to stay in the apartment. The appellant stated that he and Brown had dated at one time, but they "fell out" after he caught her cheating on him.

The appellant recalled that in the afternoon of April 9, 2001, he was out delivering flyers to promote a party. Afterward, in order to take care of last minute details, he went by a bowling alley where he was promoting a party that evening. Because the party was targeted at the "high school crowd," the party concluded early, at approximately 11:15 p.m. The appellant arrived home around midnight. There were numerous people in the apartment when the appellant got home; therefore, he went straight to his room.

---

[4] The bullet designation coincides with the corresponding gunshot wound designation, i.e. bullet A caused gunshot wound A.

The appellant stated that he called the mother of his child and spoke with her for a few minutes. Later, he called his friend, Johnny Jackson. Jackson had introduced the appellant to the victim, and all three had become friends. During the telephone conversation, Jackson suggested that he call the victim so that they could have a "three way" conversation. Once the victim joined the conversation, they talked for ten to fifteen minutes. After the conversation ended, the appellant went to sleep.

At 4:30 or 5:00 a.m., the appellant was awakened by a commotion in the apartment. He glanced out his bedroom door and saw Courtney Perry standing in the doorway of his bedroom. Brown and Corey Perry were standing in the doorway of the bathroom, and Terrance Scott was taking ice to Saulsberry, who was in the bathroom. The appellant got up to investigate and saw someone applying ice to Saulsberry's body. Saulsberry explained, "Man, I got burnt." The appellant could not see any burns on Saulsberry, so he returned to bed. Shortly thereafter, Saulsberry came into the appellant's bedroom. The appellant asked Saulsberry if he was going to the hospital. Saulsberry said he was not going to the hospital; he was waiting on his girlfriend to arrive.

On April 10, 2001, the appellant called Jackson, but he was not at home. The appellant then called the victim's house. Teamer answered the telephone. The appellant explained that he was looking for Jackson, and he asked Teamer to pass that message to the victim. Teamer told the appellant that the victim's family had been contacted by police early that morning with news that the victim was dead.

The appellant stated that he did not know he was a suspect until police arrested him on April 26, 2001. Prior to that time, police had contacted the appellant about retrieving the clothes Saulsberry was wearing when he was burned. The appellant gave the clothes to police. He gave an oral statement to police on April 14, 2001, and a written statement on April 15, 2001. The appellant asked police if he was a suspect and was told that he was not.

The appellant maintained that in April 2001, he was not in need of money. He stated that he was not rich, but at the time he had plenty of money coming in from his party promotions. The appellant asserted that he did not know why the people he thought were his friends would lie about his participation in the crimes.

Based upon the foregoing, the jury convicted the appellant of first degree premeditated murder, felony murder, and especially aggravated robbery. The jury imposed a sentence of life without the possibility of parole for each of the murder convictions. The trial court merged the two murder convictions into a single conviction. The appellant was sentenced to twenty years incarceration for the especially aggravated robbery conviction, and the trial court ordered that the sentence be served consecutively to the life sentence. On appeal, the appellant argues that the evidence is insufficient to support his convictions; the trial court erred in failing to instruct the jury that Brown, Morris, and Courtney Perry were accomplices as a matter of law; the trial court abused its discretion in allowing hearsay statements; and the trial court erred in responding to a jury

question.  We will address these issues in an order different than that in which they were raised by the appellant.

## II.  Analysis

### A.  Hearsay

The appellant argues that the trial court erred by allowing Teamer to testify to statements made by the victim.  The appellant claims that Teamer's testimony consisted of inadmissible hearsay.  The State argues that the statements made by the victim met the state of mind exception to the hearsay rule and were thus admissible.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802.  Before we decide whether the contested statements meet an exception to the prohibition against hearsay, we must first determine whether the statements were hearsay.

Teamer testified that the victim told him that he was talking with the appellant on the telephone.  The victim told Teamer that the appellant promised him that he had arranged for Brown to have sex with the appellant and the victim.  The victim told Teamer that he was going to meet the appellant at the Loft Apartments and then go to a motel for a rendezvous with Brown.

The appellant objected to this testimony as inadmissible hearsay.  The trial court overruled the objection, stating:

> [H]is testimony is not offered for the truth of the matter asserted therein.  The truth of whether the person on the other end of the phone is [the appellant] is really irrelevant for the purpose of offering this witness' testimony.
>
> And the truth of whether the victim had made arrangements with [the appellant] or some imposter or someone else to have sexual relations with this other person at a certain location is not really relevant.  The purpose of introducing this testimony was to demonstrate the state of mind that the victim was in – his impression of state of mind at the time this phone conversation took place and all these events that have transpired – what his state of mind was as he took off for this rende[z]vous that led to his death.

Thus, it appears that the trial court found that the statements were not hearsay, but if they were hearsay, they were admissible under the state of mind exception.

In the instant case, the contested statements were (1) the victim's assertion that the appellant was the other participant in the telephone conversation, and (2) the victim's assertion that the appellant had arranged for Brown to have sexual relations with him and the victim, and the victim was to meet the appellant at the Loft Apartments to facilitate that arrangement. In our view, Teamer's testimony that the victim identified the appellant as the caller is only relevant if it is true, if the appellant was in fact the caller. Likewise, the victim's plan to meet the appellant at the Loft Apartments so he could rendezvous with Brown also needs to be true to be relevant. Thus, our analysis of Teamer's testimony leads us to conclude that the statements were clearly being introduced for the truth of the matter asserted, rendering them hearsay.

After determining that the statements were hearsay, we must next decide if the statements are admissible under any exceptions to the rule against hearsay testimony. Teamer's testimony that the victim identified the appellant as the caller does not fall within an exception to the hearsay rule. Thus, we conclude that the portion of Teamer's testimony that the victim identified the appellant as the caller was not admissible.

Turning to the remainder of the statement, the State argued and the trial court agreed that the victim's plan to meet the appellant at the Loft Apartments to rendezvous with Brown fell under the "state of mind" exception to the hearsay prohibition. Tennessee Rule of Evidence 803(3) provides that the following is not excluded by the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

However, "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." Id., Advisory Comm'n Cmts.; see also State v. Hutchison, 898 S.W.2d 161, 171 (Tenn. 1994). Accordingly, we conclude that to the extent the statement regarding the victim's plan was for the purpose of proving the victim's subsequent conduct, it would be admissible under Rule 803(3). See State v. Kenneth L. Weems, No. 02C01-9401-CR-00011, 1996 WL 417652, at *4 (Tenn. Crim. App. at Jackson, July 26, 1996). However, "to the extent the testimony could be taken to prove the [appellant's] future conduct and plan relative to meeting and killing the victim, the testimony qualifies as hearsay." Id.; see also State v. Farmer, 927 S.W.2d 582, 595 (Tenn. Crim. App. 1996).

In sum, we conclude that Teamer should not have been allowed to testify that the victim said that he was talking with the appellant because the identification was inadmissible hearsay; however, we conclude that in light of the other evidence adduced at trial, the error in admitting the identification was harmless. Regardless, we conclude that Teamer was properly allowed to testify that the victim received a telephone call, the voice on the other end of the line was male, and the

victim made arrangements to meet that male at the Loft Apartments for a rendezvous with a girl. All of the permissible statements related to the victim's state of mind and were therefore admissible.

## B. Accomplice Instruction

The appellant next complains that "[t]he trial court committed plain error by not instructing the jury that Takisha Brown, Ilyas Morris, and Courtney Perry were accomplices as a matter of law." The appellant admits that he failed to preserve this issue by not including it in his motion for new trial. Typically, the failure to include an issue in a motion for new trial waives the issue on appeal. Tenn. R. App. P. 3(e) (stating "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"). However, this court may analyze any error under the plain error doctrine.

Tennessee Rule of Criminal Procedure 52(b) provides that this court may address "[a]n error which has affected the substantial rights of an accused . . . at any time, even though not raised in the motion for a new trial . . . where necessary to do substantial justice." See also Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached; (c)
> a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and (e)
> consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

In the instant case, the appellant requested that the trial court instruct the jury that Brown, Morris, and Courtney Perry were accomplices as a matter of law. After the request, the following colloquy took place:

> The Court: Well, isn't that why we have a jury?
>
> [The appellant]: Well, I believe, Your Honor, the facts support
> that each of these are accomplices. Courtney Perry, he's already been
> convicted of first-degree murder.

The Court: Even though he claims he was wrongly convicted, and through his testimony, denies any complicity in this murder. So, I mean, the jury – his testimony is before the jury just like everyone else's, and the jury could believe his version 100 percent and conclude that he was somehow unjustly convicted and that he really didn't know that a murder was about to occur and really didn't take part in a murder. I mean, that's all for the jury to decide, isn't it?

[The appellant]: I just wanted that request on the record; that we are requesting, due to the – that the evidence actually supports that they are accomplices and that Your Honor should instruct towards that.

. . . .

The Court: Right . . . . And while the proof may, in our eyes, appear that – appear to support the contention that they are accomplices, I'm reluctant to tell the jury that they have to – that that is the case and that they have to assume and conclude that they are. I think it's better left to the jury to reach that conclusion based on their interpretation of the proof, and so I'll note your exception, but I'm going to leave it as typed [and instruct the jury to make the determination whether the witnesses were accomplices].

This court has previously defined an accomplice as someone who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). Generally, the question of a witness' status as an accomplice is answered by determining whether that person could have been indicted for the charged offense. State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). If the facts about the witness' participation in the crime are clear and undisputed, the trial court should determine as a matter of law whether the witness was an accomplice. State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). However, if the facts are disputed or subject to different inferences, the jury should determine as a question of fact whether the witness was an accomplice. State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997).

In the instant case, it is undisputed that Courtney Perry was convicted of first degree murder and especially aggravated robbery for his complicity in the murder of the victim. During his trial testimony, Courtney freely admitted his complicity in the crimes. Therefore, he was an accomplice as a matter of law. See State v. Allen, 10 S.W.3d 286, 289 (Tenn. Crim. App. 1999).

Brown testified at trial that she was aware that she was the "bait" to lure the victim to be robbed. She acknowledged that she had been indicted for facilitation of first degree murder. During her trial testimony, Brown testified clearly and unequivocally regarding her involvement in the

crimes. We conclude that based upon her undisputed testimony at trial, Brown could have been indicted for especially aggravated robbery or felony murder. As such, she was an accomplice as a matter of law.

Finally, we turn to the testimony of Morris. At the beginning of his testimony, Morris asserted that he did not know that the appellant planned to rob anyone. He stated that Saulsberry woke him to drive to the Club on the Green Apartments to meet the appellant. Morris maintained that he believed the appellant was visiting a friend named David who lived in the apartments. Morris acknowledged that after he met the appellant at the Club on the Green Apartments, he took a VCR from the victim's green Blazer. Morris conceded that he helped to burn the Blazer and to dispose of the pistols.

Later in his testimony, Morris admitted that he had given a statement to police following his arrest. In his statement, Morris claimed that earlier on the day of the murder, the appellant had talked with Morris about dropping the appellant off somewhere so he could rob someone. The appellant and Morris got into Morris' vehicle and followed a man the appellant was interested in robbing. After pursuing the man for a while, Morris turned the vehicle around. The appellant saw another potential victim at a car wash; however, the man left the car wash before they were able to follow through with the plan. At that time, the appellant had Morris drive him home. The appellant then discussed calling the victim and telling him that Brown had agreed to have sexual relations with the appellant and Perry. Morris said that "[t]he plan was the same." Later, the victim arrived at the Loft Apartments, and the appellant told Morris to meet him at the Club on the Green Apartments. The remainder of Morris' statement was similar to his trial testimony.

Morris' trial testimony is far from clear or undisputed regarding his role in the crime. As we noted, at trial Morris denied any knowledge regarding the appellant's plan to rob and kill the victim. However, as the appellant has pointed out, Morris' statement to police could be construed otherwise. Further, there was no testimony from the other witnesses regarding Morris' involvement in the robbery and murder prior to his arrival at the Club on the Green Apartments. Moreover, Morris was indicted as an accessory after the fact. This court has previously opined that "being an accessory after the fact does not make one an accomplice whose testimony must be corroborated." State v. Christopher Duwan Robertson, No. M2001-00976-CCA-R3-CD, 2002 WL 31188228, *13 (Tenn. Crim. App. at Nashville, Oct. 2, 2002). We conclude that whether Morris was an accomplice was a question of fact for the jury to determine. Thus, the trial court correctly instructed the jury as to Morris.

In determining the effect of the trial court's error for failing to designate Courtney Perry and Brown accomplices as a matter of law, we note that the trial court did instruct the jury that they could find the witnesses to be accomplices. In his opening and closing statements, the appellant argued vehemently that the witnesses were accomplices. Moreover, as we note elsewhere, there was sufficient evidence to corroborate the accomplice testimony. In light of the foregoing, we conclude that the trial court's failure to instruct the jury that Courtney and Brown were accomplices as a matter of law does not rise to the level of plain error.

-14-

## C. Jury Question

The appellant argues that "[t]he trial court erred by not answering 'no' when asked by the jury whether accomplices could corroborate each other." The trial transcript reveals that during deliberations, the jury sent a question to the trial court, asking, "Your Honor, can one accomplice corroborate the testimony of another accomplice?" After receiving the question, the trial court said:

> I would assume that the answer to that would be no . . . but the only thing that concerns me a little bit in giving just a flat out no to that is that it's not always that simple because what one accomplice might testify to – might also be intermingled with or overlap what's testified to by an independent witness. And I wouldn't want them to throw out all testimony that might relate to one event simply because it's testified to by an accomplice if it's also testified to, in part, by an independent witness . . . .

The appellant responded:

> I would ask Your Honor to instruct the jury, no, No. 1, because I don't know the framework from which they're asking the question. I don't know what's going through their mind as far as how they even came up with this question. The case, State v. Boxley, says that one accomplice cannot corroborate another.
>
> . . . .
>
> And it's that simple, and it has to be applied to the facts, and I think that it's up to them to apply that to the facts however they're doing it. I don't know, so I would ask just no unless we have a further discussion that develops whatever they're reading into it. I'd ask that the answer just be no.

The State argued that the court should not give a supplemental instruction to answer the jury's question; the State encouraged the court to merely reread the accomplice instruction, the credibility instruction, and the direct and circumstantial evidence instruction. The trial court stated:

> I'm afraid that just a flat no will send a message to them that, "Uh-uh, don't even consider what these accomplices say because you can't – after all, they're just accomplices," and that's just the – I mean, I know, from a legal standpoint, one accomplice cannot corroborate the other accomplice if that's all you had. You can't bootstrap yourself up in that manner. But as a practical matter, it's not that simple, I don't think. And that's what I'm afraid of. And that's why I'm

-15-

reluctant to just say, "No," outright. I think it may be better to . . .
just reread two or three of those charges and just say, "This is the law
and go back and apply it."

After reaching its decision, the trial court brought the jury back into the courtroom and reread the pattern instructions regarding accomplices and the need for independent corroboration of accomplice testimony, the jury's duty to judge the credibility of witnesses, and consideration of direct and circumstantial evidence. The court explained to the jury,

So, in other words, if you determine that they were
accomplices in this case, then you apply the standards in the law that
are set out in the accomplice charge to their testimony. If you
determine that they were not accomplices, then you judge their
credibility and apply their testimony as you would that of any other
witness.

The jury retired to deliberate and returned with verdicts of guilty on all counts.

We note that prior to trial, the appellant requested that the trial court instruct the jury according to Tennessee Pattern Jury Instruction 42.09 as it existed at that time.[5] The pattern instruction defined an accomplice, explained that the jury was responsible for determining which witnesses were accomplices, and cautioned that accomplice testimony needed to be corroborated. The trial court complied with the appellant's request and gave the pattern instruction as it existed at the time of trial. Thus, we cannot conclude that the trial court erred in its initial instruction.

However, our analysis is not complete. It is well-settled law in Tennessee that accomplices cannot corroborate the testimony of each other. See State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001); State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997); State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995). The trial court has an obligation to properly instruct the jury. To this end, trial courts often employ pattern jury instructions. However, the pattern jury instructions occasionally "must be revised or supplemented if necessary in order to state the applicable law fully and accurately." State v. Dulsworth, 781 S.W.2d 277, 285 (Tenn. Crim. App. 1989). Moreover, a trial court has the authority to give a supplemental instruction when faced with a question from the jury. State v. Moore, 751 S.W.2d 464, 467 (Tenn. Crim. App. 1988). Supplemental instructions may be used to clarify or expound upon the original charge.

After reading the question from the jury, the trial court accurately stated that the correct answer to the jury's question is that accomplices cannot corroborate each other. However, the court

---

[5] After the trial in the instant case, our supreme court decided State v. Robinson, 146 S.W.3d 469, 509 (Tenn. 2004), which dealt with multiple accomplices testifying in the same trial. As a result of Robinson, the pattern instructions were amended to suggest that if more than one witness in a given case could be considered an accomplice, a trial court should instruct the jury that accomplices cannot corroborate each other. See Tenn. Pattern Instruction-Crim. 42.09 (2005).

-16-

expressed concerns about the jury's ability to correctly apply the instructions regarding accomplice testimony. In our view, the trial court should not have expressed such a lack of faith in the intelligence of the jury nor should the court have denied the jury a proper instruction regarding the law. Ordinarily, juries are presumed to follow the instructions given by a trial court. State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). In the instant case, the jury asked a narrowly-tailored question based upon the proof adduced at trial. Further, the question was not addressed by the original jury instructions and concerned a well-settled area of law. We conclude that, in addition to repeating the original jury instructions regarding accomplice testimony, the trial court should have instructed the jury that accomplices cannot corroborate each other. The trial court's refusal to answer the question was error. Moreover, the error was not harmless. Because the instant case so largely turns upon accomplice testimony, the jury, without the requested information, was ill-equipped to apply the law to the facts of the case. Therefore, we conclude that the appellant is entitled to a new trial.

### D. Sufficiency of the Evidence

The appellant's final issue concerns the sufficiency of the evidence supporting his convictions. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was convicted of first degree murder, which offense is defined as the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the

killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Additionally, this court has suggested that facts concerning the prior relationship between the appellant and the victim from which motive could be inferred is indicative of premeditation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

The appellant was also convicted of felony murder, which offense is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2) (2003). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2003). Additionally, the appellant was convicted of especially aggravated robbery, which offense is defined as robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and (2) (2003).

The proof at trial revealed that the victim owned a green Blazer with expensive rims. The appellant needed money to avoid being evicted from his apartment. The appellant lured the victim to his apartment with the promise that Brown would engage in sexual relations with the victim. The appellant admitted that he called the victim on the night of the murder. After the victim arrived at the appellant's apartment, the victim, the appellant, Brown, and Courtney Perry drove the victim's Blazer to an isolated area where the appellant shot the victim in the head. Later, after an unsuccessful attempt to remove the expensive rims from the Blazer, Morris, Saulsberry, Courtney, and the appellant burned the Blazer. The pistols used in the shooting were found in a nearby lake.

The appellant specifically argues that there is insufficient evidence to corroborate the testimony of Brown, Perry, and Morris. The State argues that Teamer's testimony concerning the telephone call the victim received from the appellant is sufficient independent corroboration.

In Tennessee, a felony conviction may not rest solely upon the uncorroborated testimony of an accomplice. State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). Moreover, one accomplice cannot corroborate another. Id. Corroboration exists when there is some evidence, independent of the accomplice's testimony, which suggests not only that a crime has been committed but that the accused committed the crime. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). "'This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction.'" Id. (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). It is up to the jury to determine whether sufficient corroboration exists. Id.

As we have concluded, the jury could have found that Morris was not an accomplice to the crimes. See State v. Green, 915 S.W.2d 827, 832 (Tenn. Crim. App. 1995). Thus, in the light most favorable to the State, the jury could have used Morris' testimony to corroborate the testimony of Brown and Perry. Accordingly, the proof is sufficient to support the appellant's convictions.

### III. Conclusion

Based upon the trial court's failure to answer the question submitted by the jury, we reverse the judgments of the trial court and remand for a new trial.

_____
NORMA McGEE OGLE, JUDGE