IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 9, 2008

## STATE OF TENNESSEE v. LOUIS MAYES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-04104     Chris Craft, Judge**

---

**No. W2007-02483-CCA-R3-CD  - Filed May 11, 2009**

---

The Defendant-Appellant, Louis Mayes (hereinafter "Mayes"), was convicted by a Shelby County jury of first degree premeditated murder. The only issue Mayes presents for our review is whether the evidence is sufficient to support his conviction. He specifically contends that two witnesses were accomplices as a matter of law and that his conviction was based on their uncorroborated testimony. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., concurred in results only.

Gregory Thomas Carman, Memphis, Tennessee, for the defendant-appellant, Louis Mayes.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reginald Henderson and Ray Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On May 4, 2006, Mayes and Lonzie Carter were indicted together for the first degree premeditated murder of Christopher Wallace. In a separate trial, Mayes was convicted as charged by a Shelby County jury and later sentenced to life in prison.

**Trial.** Cynthia Wallace, the victim's mother, testified that on August 7, 2005, at approximately 9:30 p.m., her son, Christopher Wallace, "sounded frantic on the phone" when he called her to come and pick him up. She told Wallace to call her back later if he still needed a ride because she was preparing his sisters for bed. She did not hear from her son again that night. The next day, she was called to a crime scene where she confirmed that the body lying face down on the ground was Christopher Wallace.

Kittrel Robinson, an officer with the Memphis Police Department, testified that on the night of the offense he was the first officer to respond to a "man down call" located at 595 Alice. Upon arrival, he found a black male lying unresponsive in the front yard with "an open wound, like a gunshot wound, in his back" and a cordless telephone in his hand. Officer Robinson noticed a trail of "blood specks" on the ground which he followed eastward to a white house that he later secured as part of the crime scene.

Willie Miles, a crime scene investigator with the Memphis Police Department, testified regarding various photographs and a cordless phone that was found at the scene, all of which were admitted into evidence. On cross-examination, Investigator Miles testified that there was no physical evidence found at the scene that linked Mayes to the crime.

Auriel Elion, the victim's girlfriend, testified that on the night of the offense, she walked to a nearby neighborhood with the victim and Robert Beecham where they encountered Mayes, Lonzie Carter, and a third man named Pancho. Carter, also known as "Mookie," was Beecham's cousin. Elion testified that the victim "exchang[ed] status" with the three men with gang handshakes. Elion explained that "exchanging status" meant "let[ting] them know who's the highest" rank in the Traveling Vice Lords. Elion testified that after the group exchanged status, Pancho "asked [the victim] who gave him his rank and [the victim] told him and . . . [Pancho] was like, well, he can't give you any rank." An argument ensued, and Elion repeatedly requested the victim to walk to the store with her. When the victim refused, Elion left him with the men and walked to the corner store. Elion returned from the store and saw the victim without his shirt on, "hollering some words" and "very upset." None of the men explained to her why they were arguing.

After Elion arrived home, she noticed that the victim had called her at 9:40 p.m. When she returned his call, the victim stated that he was "fixing to go down there and kill all them . . . because . . . they thought he was false flagging." Elion explained that "false flagging" was "representing something that you're not." Despite Elion's attempts to calm the victim, he repeated his prior threat but added, "especially that [Carter], because he was claiming [Gangster Disciples] in middle school." Elion testified that their conversation ended when the victim said, "[M]y [friends are] already on Lauderdale. They [are] on [their] way."

Elion testified that she spoke with Mayes in a later phone conversation that night. She said that Mayes wanted to know where the victim lived and also wanted her to tell the victim that "[they did not] want no trouble. [They] just want[ed] peace." Elion testified that after this conversation, she was outside when Carter, Pancho, and Mayes "pulled down" in a white Grand Am. One of them asked for Beecham and then asked whether the victim lived at her house. Elion told them that the victim did not stay with her. She observed Beecham get into the white Grand Am with the other men, and they drove away. Elion stated she went to bed.

Elion next explained that her father asked if she had heard two gunshots and that she said, "[N]o." She and her brother stepped outside and saw a white Grand Am speeding down the street. Elion testified that she and her brother walked down the street to check on the victim at his house. When they arrived, the victim was not at home, but the lights and radio were on and the door was open. Elion knew "something was wrong" because "[the victim] never goes anywhere without his

cigarettes and they were on the back of the couch." As Elion and her brother were returning home, Beecham approached them and said, "[D]on't go back around there. . . . because they shot at [the victim] and [the victim] . . . ran behind one of them houses . . . ."

The next morning, Elion's father told her that someone was found dead in the yard around the corner. Elion went to the scene, recognized the victim's body, and later provided two statements to the police. She explained that everything in the first statement was true, but she left out things because she was afraid. She identified Mayes in court and from a photospread as one of the individuals who came to her house looking for the victim. Elion testified that there were "about eight minutes" between the time that the men left her house looking for the victim and when she was asked by her father if she had heard any gunshots.

On cross-examination, Elion confirmed that the victim was a member of the Traveling Vice Lords who, although she could not explain what it meant, held rank or status as a "three star MOL." Elion reaffirmed her direct testimony; however, when asked whether the victim said that "he was going to shoot [Carter] in his face," Elion said, "Yes, sir." Elion also admitted that at a prior hearing she testified that she never saw Mayes after their phone conversation that night.

Robert Beecham testified that the victim, Carter, and Mayes were involved in an argument concerning gang rank on the night of the offense. Later that evening, while at Elion's house, Beecham overheard a telephone conversation between Elion and the victim. During the conversation, the victim said that "[h]e [was] fixing to go get his -- some of his friends and go back to the house and shoot the house up." Beecham telephoned Carter, who was also his cousin, and "told them to be careful and go in the house because [the victim] said he [was] going to come back around there and shoot the house up." Beecham confirmed that Carter, Mayes, Pancho, and Louis Blayde, the driver of the white Grand Am, came to Elion's house. Carter asked Beecham to get in the vehicle with them. Beecham testified that Pancho sat in the front passenger's seat while he sat in the back seat with Mayes and Carter. Beecham was on the driver's side, Mayes was on the passenger's side, and Carter sat between them. Beecham testified that all the men in the vehicle were members of a gang, the "Vice Lords," but he was not. The day of the offense was the first time that Beecham had met the other men in the vehicle.

Beecham testified that they drove down Alice Street and saw the victim standing on the sidewalk talking on the phone. Carter and Mayes jumped out of the vehicle. Beecham stated that Carter was armed with "a black sawed off [shotgun] wrapped in tape." Beecham could not recall what type of weapon Mayes had but knew it was a handgun. Beecham heard Mayes tell the victim not to run, but the victim began to run from the two men. Beecham testified that he heard two shots from Mayes' handgun. When asked about the shotgun, Beecham stated, "It didn't never go off." After the shooting, Beecham said the two men got back in the vehicle. Beecham walked back to Elion's house and did not see the other men again that night. He stated, "Really, I didn't know if [the victim] had been hit or not, you know. I told [Elion] and them, don't go around there. You know, a bullet don't have no name on it . . . ."

Beecham stated that he gave two statements to the police regarding the shooting. He admitted that he did not tell the truth the first time he gave a statement because he was "terrified. [He had] seen what the Vice Lords were capable of doing. So [he did not] want to end up the same

way." After everyone involved was arrested, Beecham told the truth in a second statement to the police because he felt that he and his family were no longer in danger. However, Beecham identified Mayes and Carter from a photospread both times he was interviewed by the police. Beecham confirmed that he circled a photo of Mayes from a photospread and wrote, "this is Knockout who shot two times."

On cross-examination, Beecham testified that he did not know that Mayes and Carter were armed with weapons "until [he] got in the car and . . . took off." Beecham stated that he was not a member of a gang and "didn't know exactly what was going on. [The men] didn't tell [him] what they was fixing to do." Beecham entered the vehicle because of his cousin, Carter. Beecham explained that Carter was carrying the shotgun that did not fire. He admitted that he did not mention to the police in his first statement that he was in the car with Mayes and Carter, that Mayes and Carter had weapons, or that Mayes shot at the victim. Beecham stated that he did not make any deals with the prosecution in exchange for his testimony against Mayes.

Louis Blayde, an ex-gang member, testified that he knew Mayes by his alias, "Knockout." Blayde stated that in August of 2005, he was a "foot soldier" for the Vice Lords with no rank. Blayde explained that Mayes held rank as a "Three Star Universal Elite" which, under gang rules, meant that Blayde had to do whatever Mayes said. Blayde also knew Pancho, another Vice Lord, who held rank as a "Five Star Branch Elite." Blayde explained that Mayes held a higher rank than Pancho. He stated that he met Beecham and Carter, known to him only as "Mookie," for the first time on the night of the offense and that Beecham was not a member of the Traveling Vice Lords.

Blayde stated that, on the night of the offense, Mayes and Pancho asked him to drive them around because they were about to put the victim in "V" or "violation." To put someone in "violation" was not clearly defined at trial; however, Blayde explained that he believed they were only going to give the victim a "beat down." Blayde confirmed that he drove a white Pontiac Grand Am. Blayde said that Mayes, Pancho, Carter and Beecham were in his vehicle with him on the night of the offense. Blayde stated that he did not see Mayes or Carter carrying any weapons until after Beecham had entered the vehicle. He observed Mayes with a handgun and Carter with a "gauge" or a shotgun. They drove to Alice Street and saw the victim on the sidewalk talking on the phone. Blayde stated that Mayes and Carter jumped out of the vehicle and told the victim not to run. The victim ran, and Blayde heard two gunshots. Blayde testified that after the shooting, Mayes and Carter returned to the car, and Mayes said, "I shot him." They drove off and separated. Blayde turned himself in to the police on August 18, 2005, after he learned that they were looking for him. While talking to detectives, he identified Mayes and Carter as being involved with the shooting.

On cross-examination, Blayde admitted that he did not tell the police or testify at a prior hearing that "they were going to put [the victim] in violation" because he was afraid. He did not have any "promises or deals" with the prosecution in exchange for his testimony against Mayes.

Dr. Kenneth Snell, a forensic pathologist, testified that the victim died as a result of a distant gunshot wound to the right mid-back; however, the projectile exited the victim's body on the right front chest. He stated that his findings were consistent with the victim being "bent over and running at the time he was shot." Dr. Snell roughly estimated that the victim died around midnight.

Vivian Massey, an officer with the Shelby County Sheriff's Department Gang Unit, testified that Mayes told her that he had been affiliated with the Traveling Vice Lords since the age of nine. In addition, Mayes told Officer Massey that he was known as "Monster"or "Knockout," he was a member of the "Unknown Vice Lords," and he held rank as a "Five Star Universal Elite."

Mayes presented no proof at trial.

## ANALYSIS

Mayes argues that witnesses Blayde and Beecham "should . . . have been named as accomplices by the trial court" and that there was insufficient evidence to corroborate their testimony. The State argues that the witnesses were not accomplices and even if they were, independent corroborating evidence supported their testimony.

The standard of review regarding challenges to the sufficiency of convicting evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt."). This standard is applicable to convictions predicated upon direct, circumstantial, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). On appeal, this court will not reweigh or reevaluate the evidence. State v. Grills, 114 S.W.3d 548, 551 (Tenn. Crim. App. 2001). The trier of fact, not the appellate court, resolves issues regarding the credibility of witnesses and the weight and value given to the evidence. State v. Sutton, 166 S.W.3d 686, 689-90 (Tenn. 2005). Moreover, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Id. In addition, a guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." State v. Holton, 126 S.W.3d 845, 858 (Tenn. 2004).

After the State rested its case, defense counsel asked the court if it had taken a position on whether Beecham and Blayde were accomplices because counsel was prepared to file a motion requesting that the jury be instructed they were accomplices as a matter of law. The trial court stated, "From the testimony, I can't find as a matter of law that they agreed with him as the accomplice statute says, united with the offender in committing the act. I think that would be a jury question . . . ." We note that the record does not contain a motion requesting that Beecham and Blayde be submitted to the jury as accomplices, and nothing more on the issue exists absent the motion for new trial. The trial court instructed the jury consistently with the standard accomplice jury charge leaving the question of Blayde's and Beecham's witness status for the jury to decide. See T.P.I. – Crim. 42.09.

In Tennessee, it is well established that a conviction may not be based solely upon the uncorroborated testimony of an accomplice. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citation omitted). An accomplice is a person who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of the trial. Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978). When the facts are undisputed regarding a witness's participation in a crime, it is a question of law for the trial court. See State v. Robinson, 239 S.W.3d 211, 225 (Tenn. Crim. App. 2006). On the other hand,

> [w]here . . . the witness denies all criminal connection with the crime committed, whether he be an accomplice or not is a question of fact, to be submitted to the jury along with other issues of fact, under proper instructions from the court; the burden being upon the party invoking the rule to prove by a preponderance of the evidence the guilty connection of the witness with the crime. If the jury find[s] the witness to be an accomplice, they will apply the rule requiring corroboration; but, if the jury fail[s] to so find, his evidence will be given the same weight as that of other witnesses.

Hicks v. State, 149 S.W. 1055, 1056 (Tenn. 1912).

> The Tennessee Supreme Court has previously described corroboration as some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). It is up to the jury to determine whether sufficient corroboration exists. Id.

In this case, Mayes stresses that both witnesses were accomplices as a matter of law primarily because they were in the vehicle with him before the crime was committed and assisted him by either driving away from the crime scene or initially concealing the crime from the police. We agree that Blayde's witness status is a very close question. However, as previously stated, an accomplice as a matter of law must knowingly, voluntarily, and with common intent participate with the principal offender in the commission of the crime alleged in the charging instrument. Griffis, 964 S.W.2d at 588. In this case, Mayes, the principal offender, was charged with first degree premeditated murder. Therefore, in order to be considered an accomplice as a matter of law, the record must show that Blayde knowingly, voluntarily, and with common intent participated in the commission of first degree premeditated murder.

Significantly, the record shows that Blayde was not present during the initial confrontation between Mayes and the victim. Blayde also testified that even though he drove the other men in his vehicle to find the victim, he was initially unaware that they were armed with weapons. Although Blayde admitted that he knew the other men were about to put the victim in "V" or "violation", this term was not defined at trial. In his experience, Blayde explained that a "violation" only involved giving the victim a "beat down." Defense counsel specifically questioned Blayde on this issue by asking, "You've never heard of a violation where somebody got killed?" Blayde responded, "No." The record shows defense counsel attempted to further develop what was meant by a "violation" through Blayde again, by asking, "So for five years [as a gang member] you're saying you [have] never heard of a violation where somebody might be killed?" Blayde responded, "No." While it is troubling that Blayde knew the other men intended to harm the victim in some way, the proof does not establish that Blayde knowingly, voluntarily, and with common intent participated in the commission of first degree premeditated murder. Therefore, we conclude that the trial court properly submitted the question of Blayde's status as a witness to the jury. See Jimmy Dale Smith v. State, No. 01C01-9205-CC-00152, 1995 WL 84021, at *19 (Tenn. Crim. App., at Nashville, Mar. 2, 1995) (concluding that the status of an unindicted witness who testified that he thought he was assisting the defendant in committing a burglary but unwittingly assisted him in a kidnaping was a question for the jury). Moreover, given our later discussion and conclusion regarding Beecham's witness status, we conclude that even if there was error, it was harmless. Tenn. R. Crim. P. 52 (a) ("No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits.").

In regard to Beecham's status as a witness, the record shows that Beecham did not know Mayes' or Carter's intentions when he entered the vehicle on the night of the offense. Beecham was not a member of the Traveling Vice Lords and did not know any of the men prior to entering the vehicle except his cousin, Carter. Beecham also testified that he did not know that Mayes or Carter were armed with weapons until after he had entered the vehicle and "took off." In our view, the evidence regarding Beecham's participation in the commission of the charged offense was susceptible to different inferences. See, e.g., State v. Robert Wayne Marler, No. E2003-02179-CCA-R3-CD, 2004 WL 1562529, at *5 (Tenn. Crim. App., at Knoxville, July 12, 2004) (concluding that the status of unindicted witness who was with the defendant before, during, and after the commission of the crime was a question for the jury). The trial court did not err by submitting the question of Beecham's status as a witness to the jury with the proper instructions. We must presume that the jury followed the instructions given to them by the court. Henley v. State, 960 S.W.2d 572, 581 (Tenn. 1997). Upon reviewing this record, we conclude that a reasonable juror could have determined that neither Blayde nor Beecham were accomplices. As such, no corroboration was necessary. We likewise conclude that a reasonable juror could have determined that Blayde was an accomplice and used Beecham's testimony as corroboration. Therefore, viewed in the light most favorable to the State, the evidence is sufficient to support Mayes' conviction for first degree premeditated murder.

## CONCLUSION

Based on the foregoing analysis and authority, the judgment of the trial court is affirmed.

_____

CAMILLE R. McMULLEN, JUDGE