IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2014

**TYREE ROBINSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 01-13118      Paula Skahan, Judge**

**No. W2013-00848-CCA-R3-PC  - Filed September 16, 2014**

The petitioner was convicted of first degree premeditated murder, felony murder, and especially aggravated robbery, for which he was sentenced to life imprisonment and twenty years, to be served consecutively.  He filed a timely petition for post-conviction relief, asserting that trial counsel was ineffective in dealing with a State's witness; in not objecting to certain parts of the State's closing argument; and in failing to conduct a proper investigation.  The post-conviction court found that each claim was without merit, and, following our review, we conclude that the record supports that determination. Accordingly, we affirm the order of the post-conviction court denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

James E. Thomas, Memphis, Tennessee (on appeal); and James Arnold, Germantown, Tennessee (at hearing), for the appellant, Tyree Robinson.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Morris, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This court's opinion on the petitioner's second direct appeal provides the following summary of the evidence introduced at his trial:

This case arises out of the April 2001 murder of the victim, O'Neil Cornish, for which the [petitioner] was indicted and convicted of first degree premeditated murder, felony murder, and especially aggravated robbery. On direct appeal, this court reversed the judgments of the trial court and remanded for a new trial, concluding that the trial court erred in failing to instruct the jury, in response to its question, that accomplices cannot corroborate each other. State v. Robinson, 239 S.W.3d 211 (Tenn. Crim. App. 2006). The second trial was conducted from January 28 to February 1, 2008.

**State's Proof**

Sergeant Eric Freeman with the Memphis Police Department testified that he was working as a crime scene officer on April 10, 2001 and responded to a "D O A unknown" call near Shepherds Tree Street and Kilarney Avenue. The scene was a dead-end street that had been cleared for development, but was being used as a dumping ground. At the scene, he found a young black male with a gunshot wound lying in the street and a large amount of blood around the body. He also found several .380 shell casings, a bullet fragment, loose tobacco, a cigar tip, blood-stained tissue paper, a sales receipt, a troweling or cutting wheel, and a Waffle House identification card with the name Jennifer. Sergeant Freeman noted that the victim had twenty-five dollars in his sock.

Percy Alexander, retired battalion chief with the Memphis Fire Department, testified that he was driving around searching for his lost dog on the morning of April 10, 2001, in the area of Shepherds Tree Street and Kilarney Avenue. As he looked into a cove, Alexander saw the motionless victim lying on the ground, got out of his car, and approached the victim. He saw a stream of blood and noticed that the victim had a wound to his head and was deceased. Alexander returned to his car, called 911, and waited for the police to arrive.

Seku Teamer, the best friend of the victim, testified that he and the victim were at Wing City, a nightclub, in the early morning hours of April 10, 2001, when the victim received a phone call. The voice on the phone appeared to be that of a male. The two left the nightclub approximately fifteen minutes after the victim received the phone call. The victim dropped Teamer off at the home they shared, saying he was going to the Loft Apartments "to have intercourse with Takisha Brown and he was going to join in with [the petitioner]." The victim then drove away in his Blazer with relatively new,

-2-

flashy rims.

Ilyas Morris, also known as "Big E," testified that in April 2001 he lived with the [petitioner], Cortney Perry,[1] Takisha Brown, Terrance Scott, and Willie Rosser at the Loft Apartments. On April 10, 2001, Morris was trying to sleep downstairs in the apartment when he heard the [petitioner], Brown, and Perry talking upstairs, but he could not recall the nature of their conversation. He then heard the three leave the apartment.

Morris said that he subsequently was awakened by Mieko Saulsberry, one of the [petitioner]'s friends, who wanted Morris to go with him to meet the [petitioner] at Club on the Green, another apartment complex. The two drove Morris' van to Club on the Green, but the [petitioner] was not there so they waited. As they were getting ready to leave, a green truck with custom rims pulled in flashing its lights. Morris saw that the [petitioner] was driving the truck and that Brown and Perry were with him. Morris had never seen the truck before and knew it did not belong to the [petitioner]. Everyone got out of the truck, and the [petitioner] removed all of his clothes except his underwear. Morris looked inside the truck and saw "[a] lot" of blood on the driver's seat. He also saw a VCR on the passenger's side, which he took and put in his van.

Morris testified that they all left in his van and went back to the Loft Apartments to look for a floor jack to remove the rims from the green truck, but they were unable to find one. The [petitioner] then directed Morris to where the victim's body was located to make sure the victim was dead. When they got to the body, the [petitioner] told Perry to shoot the victim again. Perry grabbed a gun off the floorboard of Morris' van, got out, and shot the victim two to four times. Morris said the gun did not belong to him and described it as a small silver .380. There was also another gun on the floorboard – a larger .380 with the safety missing, which Morris knew belonged to the [petitioner]. After Perry shot the victim, the group returned to the Loft Apartments to look again for a floor jack.

Morris recalled that he drove the group to a gas station, and they purchased a gallon of gas in a Jungle Juice container. They drove back to the victim's truck at Club on the Green, and Saulsberry and Perry threw the gas on

---

[1]Cortney Perry's brother, Corey Perry, was mentioned during trial but did not testify. Hereinafter, "Perry" will refer to Cortney Perry.

the truck and burned it. Saulsberry received second degree burns in the process. After burning the truck, everyone got back into the van and returned to the Loft Apartments. Morris said that approximately a week later, the police questioned him, the [petitioner], and Perry about Saulsberry's burns. Morris told the police that he did not know anything about the burns. Morris said he met the [petitioner] and Perry afterwards to dispose of the guns and drove them to the [petitioner]'s mother's house where the [petitioner] retrieved the guns. Morris then drove the [petitioner] and Perry to Coro Lake where they threw the guns into the water. Morris was later arrested and told the police everything that had happened and helped them locate the guns. Morris said he pled guilty to accessory after the fact due to his involvement.

On cross-examination, Morris acknowledged that when he was arrested, he was informed that he could be charged with murder. He admitted that in his statement to police approximately two weeks after the murder, he said it was the [petitioner], not Saulsberry, who awakened him and told him to go to Club on the Green. He testified that he could not remember who it was that actually woke him that night. Morris acknowledged that he overheard the [petitioner], Brown, and Perry talking about robbing the victim, but said he did not think the [petitioner] was serious. He admitted that by picking the [petitioner] up afterwards, he was, in effect, acting as the getaway driver. On redirect, Morris said that he was the only one in the household who had a vehicle, and he drove where the [petitioner] told him.

Mieko Saulsberry testified that he, Cortney Perry, Ilyas Morris, and others lived with the [petitioner] at the Loft Apartments in April 2001. At the time, the [petitioner] had an entertainment company called "In Town Entertainment," and Saulsberry worked security and played instruments for him. During the early morning hours of April 10, 2001, Saulsberry was asleep in the [petitioner]'s room when the [petitioner] woke him and told him to get in Morris' van. Morris, Perry, and Brown were already in the van, and they drove to a gas station and purchased gas in a milk or Jungle Juice jug. Saulsberry stated that he asked the [petitioner] what was happening, and the [petitioner] told him the less he knew the better. They then drove to the location of the victim's body.

Saulsberry said that when they arrived at the victim's body, the [petitioner] told Perry to get out of the van. Perry got out and shot the victim twice. They then drove to Club on the Green Apartments and proceeded to the back of the complex where a truck with "high profile . . . chrome rims" was

parked. The [petitioner], Perry, and Brown "wip[ed] down the truck," tried to remove the rims and radio, and poured gasoline on the truck. Because they had spilled gasoline on themselves, the [petitioner] asked Saulsberry to light the fire, which he did. The truck exploded, and Saulsberry was severely burned. Saulsberry's girlfriend eventually took him to the hospital where he was questioned by the police and told them a fabricated story. However, he later told the police the truth and pled guilty to the offense of burning personal property.

Takisha Brown testified that she was dating Cortney Perry's brother, Corey, at the time of the murder. At that time, Cortney, Corey, Mieko Saulsberry, and the [petitioner] lived together at the Loft Apartments, and Ilyas Morris stayed there occasionally. Brown said that she sometimes stayed there with Corey but actually lived with her mother. On the evening of April 9 or 10, Brown returned to the Loft Apartments after seeing a movie with a friend and recalled that the [petitioner], Cortney, Corey, Morris, and possibly Saulsberry were there when she arrived. The [petitioner] and Cortney were discussing "[w]hat was getting ready to happen," and the [petitioner] asked Brown if she would tell the victim that she would have sex with him in an effort to get him to drive over quickly so the [petitioner] could rob him. Brown agreed because she had been using drugs all day and was not "thinking."

Brown said that the [petitioner] called the victim and that she told the victim she would go along with him and the [petitioner]. When the victim arrived, Brown, Cortney Perry, and the [petitioner] went outside and got into the victim's vehicle. The victim was driving, Perry was in the passenger's seat, Brown was seated behind Perry, and the [petitioner] was seated behind the victim. They went to a gas station to get a cigar to fill with marijuana, then drove to an undeveloped area to smoke the marijuana. While they smoked, the victim started talking about his .380 handgun and pulled it out of the glovebox to show the [petitioner].

Brown recalled that the [petitioner] asked to see the victim's gun and, after denying that he owned a gun, pulled out his gun and shot the victim. The [petitioner] got out and opened the driver's door, causing the victim to fall out on the ground. The [petitioner] then got in the driver's seat and drove to the Club on the Green Apartments where Saulsberry and Morris were waiting. Brown got into Morris' van, while the men donned gloves and searched the victim's truck. Brown saw the [petitioner] take off his clothes that were

covered in blood, and everyone got into Morris' van.

Brown testified that the [petitioner] directed Morris to drive back to the victim's body. The [petitioner] tried to shoot the victim, but his gun jammed so he told Perry to shoot the victim with another gun. They drove back to the Loft Apartments, and she went inside and told Corey what had happened. The [petitioner], Perry, Saulsberry, and Morris left again, but returned later with Saulsberry screaming that he had been burned. Brown admitted that she pled guilty to facilitation of an aggravated robbery for her involvement.

Cortney Perry testified that at the time of the murder, he was living with the [petitioner] at the Loft Apartments along with his brother, Ilyas Morris, Mieko Saulsberry, and Terrance Scott. On April 9, 2001, Perry was asleep when the [petitioner] woke him saying that they needed rent money and that he had a plan to rob and kill the victim. According to Perry, the [petitioner] was going to call the victim and offer to get him a hotel room so he could have sex with Takisha Brown, and then the [petitioner] "was going to do him in." The [petitioner] received a phone call from the victim and then told Perry that he was "just kidding" about doing anything to the victim. The [petitioner] told Perry that he and the victim were going to smoke marijuana and have sex with Brown. Perry decided to go along to see if Brown was going to cheat on his brother, Corey.

Perry testified that he, the [petitioner], the victim, and Brown drove around looking for an open gas station so they could purchase a cigar to use to smoke marijuana. The [petitioner] directed the victim to drive to a cove near Shepherds Tree and Kilarney, and the [petitioner] and the victim started talking about guns. The victim reached under the radio and retrieved his gun to show the [petitioner], and the [petitioner] asked to see it. The victim obliged, and the [petitioner] began unloading and loading the bullets. Perry noted that he had started to fall asleep when he heard a gunshot and instinctively jumped out of the car. He heard a second shot as he ducked down near the rear of the vehicle. At that point, the [petitioner] got out of the vehicle, pulled the victim out, and got in the driver's seat. Brown moved into the passenger's seat, and Perry started to walk off but ended up getting back in the vehicle.

Perry recalled that the [petitioner] drove them to Club on the Green Apartments where they met Morris and Saulsberry. The [petitioner] told him and Brown to get into Morris' van, and the [petitioner] proceeded to take off

his clothes. Morris got out of his van, took something out of the victim's truck, got back in the van, and they started to drive toward the Loft Apartments. On the way, the [petitioner] directed Morris back to the victim's location and, while waving his "big chrome gun," told Perry that Perry was going to shoot the victim to make sure he was dead. After telling the [petitioner] he was not going to do it, Perry got out of the van and shot the victim with the victim's gun that the [petitioner] handed him. Then, they drove to a gas station to purchase fuel to burn the victim's truck, returned to the truck, and set it on fire. Saulsberry was burned in the process.

Perry testified that he and the [petitioner] were questioned by the police a few days after the murder, but they were not arrested. Sometime after talking to the police, Perry, the [petitioner], and Morris went to the [petitioner]'s mother's house where the [petitioner] grabbed a bag containing the guns from the back of the house. Perry stated that the [petitioner] "implied" that he wanted to throw the guns into Coro Lake, so they went to the lake and threw them in. Perry testified that he was arrested approximately a week later and told the police everything. He admitted that he was currently serving a life sentence as a result of his involvement in the murder. Perry recalled that the [petitioner]'s gun was a Lorcin and that the [petitioner] and Brown had been in a relationship but that was before he knew the [petitioner].

Dr. O.C. Smith, Shelby County Medical Examiner at the time of the incident, testified that he performed the autopsy on the victim. Dr. Smith noted that the victim sustained two contact gunshot wounds to the head, which damaged the brain, and three gunshot wounds to the body. It was Dr. Smith's opinion that the gunshot wounds to the body occurred post-mortem. With regard to the gunshot wounds to the head, Dr. Smith stated that both wounds "went from up to down, went from right to left and went from back to front slightly." He recovered projectiles from both head wounds.

Officer Vennes Owens with the Memphis Police Department testified that she assisted with the homicide investigation in this case. Officer Owens recalled that Ilyas Morris led the officers to Coro Lake where two pistols were recovered. Morris also led the officers to the Loft Apartments where a plastic jug that had been used to transport gasoline was discarded.

Officer Reginald Morgan with the Memphis Police Department testified that he was the case officer in the investigation of the victim's murder. As part of his investigation, Officer Morgan went to Club on the Green Apartments

where the victim's burned vehicle was found, and he also went to the morgue to retrieve the bullets that were recovered from the victim's body during autopsy. He transported those bullets as well as the guns recovered from Coro Lake to the Tennessee Bureau of Investigation (TBI) Crime Lab in Nashville for comparison.

Cervinia Braswell, forensic scientist and firearms examiner with the TBI, testified that the guns sent to the TBI for testing in this case were a .380 Lorcin pistol with the safety missing and a smaller gun – a .380 Davis. Both guns were caked with mud and rust but were operable after being cleaned. The TBI also received five bullets recovered from the victim's body during autopsy, one of which was unable to be examined due to damage caused when it entered the body. Two of the bullets had the same class characteristics of the Lorcin gun as well as similar individual characteristics, but not enough to say with 100% certainty that the bullets were fired from that particular Lorcin gun. The other two bullets had the same class characteristics of the Davis gun as well as similar individual characteristics, again, but not enough to say with 100% certainty that the bullets were fired from that particular Davis gun.

**Defense Proof**

Lolita Kent stated that in April 2001 she was the manager of a gas station near Airways Boulevard and Holmes Road and was working the overnight shift on April 9, 2001. She recalled that a man purchased gas and put it in a jug of some type around 2:00 a.m. She described the man who bought the gas as heavyset, weighing approximately 207 pounds, and having dreadlocks in his hair. She did not recognize the man who bought the gas as anyone in the courtroom. She said that the man drove a lime green truck with tinted windows and rims. Kent explained that she paid attention to the truck because she had seen it before at the gas station, but the man who paid for the gas was not the usual driver of that truck.

Shalando Madkins stated that the [petitioner] and Takisha Brown "fooled around with each other" for about a month in 2000 or 2001. She recalled that the [petitioner] and Brown argued often and said that one time "probably [in] the summer of 2000," Brown attacked the [petitioner] with a knife.

Mark Williams, long-time friend of the [petitioner], testified that the [petitioner] is left-handed. Williams stated that he also knew Mieko

-8-

Saulsberry and did not consider him to have a good reputation for truthfulness in the community.

After the conclusion of the proof, the jury found the [petitioner] guilty of felony murder, premeditated murder, and especially aggravated robbery. The felony murder conviction was merged into the premeditated murder conviction, and the jury sentenced him to life imprisonment. The [petitioner] was sentenced to twenty years for the especially aggravated robbery conviction, to be served consecutively to the life sentence. The [petitioner] appealed.

State v. Tyree Robinson, No. W2008-01001-CCA-R3-CD, 2009 WL 1741401, at *1-6 (Tenn. Crim. App. June 16, 2009), perm. app. denied (Tenn. Nov. 23, 2009).

Testifying at the evidentiary hearing in this matter were the petitioner's former trial and appellate lawyers, as well as the petitioner himself. We will review their testimony.

Trial counsel explained how he had proceeded in preparing the petitioner's defense:

The same way I prepare for all my trials. I hire an investigator. I review the discovery. I review the memos and I consult with my client. And I proceed forward with the best theory I feel like is in the best interest of my client, both on the facts presented in the investigation and as presented to me.

He said that because he was called into the evidentiary hearing at "the last minute," he had not reviewed his file in the matter and was "going off whatever [he] ha[d] in [his] head." He recalled that there was "some issue about a jailhouse letter" but that the name "Seku Teamer" did not "ring a bell." He said he did not object to the portions of the State's closing argument quoted in the post-conviction petition or raise it as an issue in the motion for new trial, as best he recalled.

Trial counsel explained how he determined what issues should be in that motion:

I raised those issues or did not raise them after consulting with my appellate counsel, . . ., because I don't do appellate work. I do my trial work and then I go to my appellate lawyer before I construct my motion for new trial. I show him what my issues I think they are, and they tell me whether or not they have viable grounds at the court of appeals [sic]. If my appellate counsel tells me they do not have viable grounds at the court of appeals [sic], I do not waste the time in a motion for new trial. That may be something you

can address with [appellate counsel].

In his pretrial preparation, trial counsel said that he "saw no alternative theories." He explained his investigation regarding the petitioner's claim that he was not at the scene when the crimes were committed:

> Yes, [the petitioner] told me that he was not there. Yes, he led my investigators down numerous paths to try to prove that he wasn't there or at least bring me a witness to say that he wasn't there. Without evidence, I don't present a defense. I had no evidence other than what [the petitioner] told me.

In his testimony, the petitioner explained his reasons for filing the petition:[2] "Ineffective assistance of counsel on many reasons. I mean, I don't believe that I had a fair hearing because . . . there was just no adversarial test to the State's proof, period. I mean, it was like he just left me . . . with no defense whatsoever."

The petitioner explained that he was at home when he heard "all the noise," and Mieko Saulsberry came into his room and said, "I got burned, I got burned." Saulsberry said he had been "playing with – messing with some fire with a barbecue grill." The petitioner said that the prosecution theory was that he was "the one who was hiding all the evidence," while, in fact, he was the one who consented to a search of the house and gave a statement to the police, none of which was told to the jury. He told counsel that he was not involved in the crimes. He characterized the State's closing argument as:

> It basically was like . . . that what [the prosecutor] wanted [the jurors] to do was about their conscience and this that, this that, and not about the evidence. You know, [the prosecutor] wasn't talking about the evidence. [The prosecutor] was basically like I said, trying to inflame the passion of the jury. Trying to make them feel sad. You know, trying to make them feel a certain way instead of focusing on the evidence of the trial.

The petitioner claimed that appellate counsel "[n]ever" contacted him, although the petitioner "sent him letters." He said that he received the appellate brief written by his counsel only after it had been filed and that none of the issues raised were in his motion for new trial. Further, he said that the testimony of Seku Teamer was "hearsay and the appeal courts had already ruled that Seku Teamer being with the victim when the victim supposedly

---

[2]Although, during his testimony at the evidentiary hearing, the petitioner raised a number of claims of ineffective trial and appellate counsel, we will consider only those which have been continued on appeal.

received the call." At the second trial, Seku Teamer again was "allowed . . . to get on the stand and say that the victim was going to meet with [the petitioner]." In closing argument, "the prosecution used this evidence . . . three or four times." Further, the petitioner said that Ilyas Morris "admitted that he knew about the crime before it happened" and "that made him a co-defendant," not an accessory after the fact, as he was charged.

Appellate counsel testified that he did not discuss the appeal with the petitioner but based it upon the trial record. He explained the process he followed when writing an appellate brief:

> Typically . . . when I write a brief, I go through those issues and determine if any of them are viable. You know you can preserve issues all day long. If it's not an issue that's a[n] issue that you could possibly prevail on, you've wasted your time writing. . . .

> So, yes, I went through the motion for new trial. I eliminated what issues weren't good issues and I did the brief with what we had left which I believe in this case was sufficiency of the evidence.

Counsel felt that any claims that the prosecution's final arguments entitled the petitioner to relief were "not viable."

## ANALYSIS

### I. Ineffective Assistance of Counsel

We will review the claims which the post-conviction court gleaned from the petitioner's testimony at the evidentiary hearing, for it is somewhat difficult to divine whether he has proceeded with all of these claims on appeal.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only

-11-

to the post-conviction court's findings of fact.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding.  Strickland v. Washington, 466 U.S. 668, 687(1984); see  State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App.1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee).  The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)).  Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see  Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation.  See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).  The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  The same principles apply in determining the effectiveness of trial and appellate counsel.  Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one."  466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

## A.  Not Objecting to Testimony of Seku Teamer

-12-

The petitioner argues that trial counsel was ineffective in not objecting to the testimony of this witness as hearsay and not impeaching Teamer with a prior inconsistent statement.

In brief, at the first trial, Teamer testified that, earlier that evening, he had been with the victim, who told him that he was speaking on the telephone with the petitioner, who had arranged for him to have sex with Brown. On appeal, this court explained that Teamer's statements should not have been allowed because they were hearsay but "that in light of the other evidence adduced at trial, the error in admitting the identification was harmless." State v. Robinson, 239 S.W.3d 211, 224 (Tenn. Crim. App. 2006). The court then explained that Teamer was properly allowed to "testify that the victim received a telephone call, the voice on the other end of the line was male, and the victim made arrangements to meet that male at the Loft Apartments for a rendezvous with a girl." Id.

At the retrial of this matter, the State proceeded with Teamer as this court earlier had concluded was allowable:

> Seku Teamer, the best friend of the victim, testified that he and the victim were at Wing City, a nightclub, in the early morning hours of April 10, 2001, when the victim received a phone call. The voice on the phone appeared to be that of a male. The two left the nightclub approximately fifteen minutes after the victim received the phone call. The victim dropped Teamer off at the home they shared, saying he was going to the Loft Apartments "to have intercourse with Takisha Brown and he was going to join in with [the petitioner]." The victim then drove away in his Blazer with relatively new, flashy rims.

Tyree Robinson, 2009 WL 1741401, at *2.

As to this claim, the post-conviction court found that this court earlier had held that error in admitting testimony as to identity was harmless and that, as a result, the petitioner failed to prove either that trial counsel was deficient or that the petitioner was prejudiced. The record supports this determination.

The petitioner also complains that trial counsel should have impeached Teamer with a prior statement that the caller was male. As the post-conviction court pointed out, trial counsel did question Teamer as to whether the voice he heard was male or female. Thus, as the court noted, the petitioner simply disagrees with trial counsel's decision as to how the cross-examination of the witness should have proceeded. The court concluded that the petitioner failed to show he was prejudiced by this decision, and the record supports this

-13-

determination.

## B. State's Closing Argument

The petitioner argues that trial and appellate counsel were ineffective in not objecting to the State's closing argument at trial, in presenting this as an issue in the motion for new trial or on appeal as plain error. As we understand his complaint, it is directed to the following statements during the State's initial closing argument:

> The sound of the laughter at the Loft Apartments when they got Keisha to agree to it. Got poor O'Neil Cornish to agree hook, line and sinker to meet [the petitioner]. You heard Seku Teamer. They were at the Wings together. O'Neil got a phone call. They leave the bar and the next thing he knows he says I'm going [to] go meet [the petitioner], he's going to hook me up with a girl. Seku never saw his . . . best friend again.

As to the petitioner's complaints regarding trial counsel's not objecting to the State's closing argument referencing Teamer's testimony, the post-conviction court found that, because this court subsequently determined that admission of this testimony was harmless error, the State's use of it in closing argument did "not rise to the level constituting prejudice."

Additionally, regarding the closing argument, the petitioner argues that trial counsel was ineffective by failing to object to the State's "inflammatory and improper" closing argument and that appellate counsel was ineffective as well in not presenting this claim on appeal. The petitioner's specific complaint regarding the argument was that the State "call[ed] on the jury to send a message rather than to convict on the evidence." While it is true, as the defendant asserts, that the post-conviction court did not clearly rule on this claim, it is not clear to this court that, in his lengthy and rambling testimony at the evidentiary hearing, the petitioner made this specific claim. However, based upon our review of the State's closing arguments, we easily conclude that even if this argument were improper, it did not rise to the level of reversible error, nor was counsel ineffective by not raising it as an issue in the motion for new trial or on appeal.

## C. Failure to Conduct Proper Investigation

Finally, the petitioner complains that trial counsel was ineffective for failing to "properly investigate petitioner's case." In this regard, we note that, at the evidentiary hearing, the petitioner presented neither documents nor evidence to support his claim. Assuming that the petitioner is referring to the fact that trial counsel did not obtain the

presence of "Gerald" to testify at the trial, the post-conviction court explained that the petitioner had failed to present any evidence that the presentation of this witness as an alternative suspect would have affected the outcome of the case. This finding is bolstered by the facts that, because the witness did not testify at the evidentiary hearing, we are left to speculate as to whether he exists, much less what his testimony might have been. Thus, the record supports the post-conviction court's finding that, as to this issue as well, the petitioner has failed to show either that counsel was ineffective or that he was prejudiced thereby.

Also, as to this issue, the petitioner makes the conclusory argument on appeal that trial counsel was ineffective because he "could not recall . . . any specific investigation that he undertook other than hiring an investigator"; that counsel's "lack of memory [at the hearing] as well as . . . his lack [of] preparedness at trial" were evidence of "an inadequate investigation"; that he "did not carefully review the previous opinion in the petitioner's first appeal, nor did he adequately review the discovery"; and "[m]oreover, [he] failed to adequately investigate the contents of a letter allegedly written by petitioner's co-defendant." In making these general complaints, the petitioner has failed to show what the results would have been had counsel taken these actions. Accordingly, he has failed to established prejudice as the result of counsel's alleged shortcomings.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's determination that the petitioner is not entitled to post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-15-