# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 25, 2016

## MICHAEL DEON MILLS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 98950    Bobby R. McGee, Judge**

_____

**No. E2016-01544-CCA-R3-PC – Filed November 21, 2016**

_____

Michael Deon Mills ("the Petitioner") was convicted of two counts of especially aggravated kidnapping, one count of especially aggravated robbery, and one count of aggravated burglary by a Knox County jury. The trial court sentenced the Petitioner to an effective sentence of twenty-five years with release eligibility after service of 100% of the sentence in the Department of Correction. On appeal, this court affirmed the Petitioner's convictions. The Petitioner filed a petition for post-conviction relief, which the post-conviction court denied. The Petitioner argues on appeal that trial counsel's performance was deficient and that he was prejudiced by the ineffective assistance of trial counsel. On appeal, we affirm the post-conviction court's denial of relief to the Petitioner.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, for the appellant, Michael Deon Mills.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Charme P. Allen, District Attorney General; and Phillip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

*Jury Trial*

On direct appeal, this court summarized the testimony presented at trial as follows:

[Co-defendant] [t]wenty-two-year-old Brandon Tarver testified that the [Petitioner and co-defendant Kenneth Spencer] were his friends. At the time of trial, he had known [the Petitioner] and [co-defendant Spencer] three and ten years, respectively. About 6:00 p.m. on August 8, 2007, [co-defendants] Tarver and Spencer went to [co-defendant] Tarver's father's house on Apex Drive off Sutherland Avenue in Knoxville. [The Petitioner] also went to the house. At some point, [co-defendant] Spencer went back to his home off Magnolia Avenue. [The Petitioner] also left [co-defendant] Tarver's father's home on Apex Drive. [Co-defendant] Tarver said that he and a girl named Tiffany later met up with [co-defendant] Spencer at [co-defendant] Spencer's house. At that point, [co-defendant] Tarver refused to testify further, saying, "I have nothing else to say. I got my time. I wanna do my time."

Philip Lim testified that in August 2007, he lived in a two-story home on Bradshaw Garden Drive. On the night of August 8, he was at home with his then nineteen-year-old son, Shawn, and thirteen-year-old daughter, Heidi. Shortly before midnight, Philip was standing in his living room while watching television and drinking soup. Someone knocked open the front door, and three or four people wearing bandanas over their faces came into the house. Philip said a black male pointed a "long" gun at his face and told him, "I will kill you. I will kill you." A white male with an aluminum baseball bat hit Philip a few times on his back. Philip ran into the kitchen, and the man with the bat followed him. Philip said that the men wanted to know if he had any drugs and that he told them, "No. I don't have drugs. I don't even smoke." Philip said he was "running scared"; screamed, "Call 911. Call 911"; picked up a barstool; and threw it at the man with the gun. He said that a second living room and his children's bedrooms were in the basement and that he headed downstairs.

Philip testified that he stumbled on the steps to the basement and that the man with the bat began beating him. Philip ran into Heidi's bedroom and tried to hold the door closed, but the man overpowered him, came into

the room, and hit him on the head and back with the bat. Philip fought with the man for about five minutes and ran out of the room. The man followed and continued to beat him, and Philip fell next to a couch in the basement living room. The man told him to take off a gold bracelet he was wearing, but Philip could not get the bracelet off because his thumb was swollen. The man beat Philip with the bat, yanked the bracelet off his wrist, and told him to take out his wallet. Philip did as instructed, and the man took about sixty dollars out of the wallet. The man also pulled a telephone cord out of the wall. Philip took a cellular telephone out of his pocket in order to dial 9-1-1, but the man broke it into two pieces.

Philip testified that the man "cornered" him under a piano and that he told the man, "Please don't kill me. I've got beautiful children." The man forced him to stay under the piano and did not leave him until the police arrived. At that point, the man broke through the basement's sliding glass door and ran outside. The police came into the house and took Philip upstairs, where he saw his son. He said his head and his son's head were bleeding. The police captured a black intruder and a white intruder still in the house. Philip's son asked to see the two men but did not recognize them. Paramedics took Philip to the University of Tennessee Hospital. His thumb was broken, he could not raise his hand, and he had injuries to his neck and back. He said that the man with the bat had hit him twenty or thirty times, that his head was split open, and that he received staples in his head. He was in extreme pain after the attack and went to physical therapy for months. At the time of trial, he was still seeing his doctor for treatment and was in counseling. He said that he did not own a gun or baseball bat and that neither of those items had been in his home before the robbery.

On cross-examination, Philip testified that a briefcase containing jewelry had been in his bedroom closet and that one of the men found the briefcase and opened it. Philip's arms were bruised during the attack when he held them up to protect his neck. He said that the intruders damaged a couch and mattress, that they broke doors and windows, and that blood was "everywhere." The intruders caused eighteen to twenty thousand dollars['] worth of damage to his house.

Shawn Lim testified that on the night of August 8, 2007, he was downstairs and getting ready for bed. Suddenly, he heard his father upstairs yelling, "[C]all 911, help." Shawn was scared and did not know what was going on. He ran upstairs and saw a tall black male with a bandana over his face and holding a gun. Shawn grabbed the gun and struggled with the man. He said he could not see his father but heard "other commotion" in

- 3 -

the kitchen area. Suddenly, someone hit Shawn on the back of his head with a baseball bat. He said he blacked out for a moment, fell over the couch, and was beaten with the bat and the butt of the gun. He said two men told him, "Don't try and be brave or anything, sit down, stay right here." While the men were with him, Shawn could hear his father screaming downstairs. The man with the bat left, and the man with the gun moved Shawn to a bathroom. Shawn grabbed a towel and held it to his head. The man with the gun told Shawn to sit in the bathroom and stayed with him until the police arrived. Shawn said that while he was in the bathroom, he could see someone with a baseball bat walking "back and forth," searching the upstairs bedrooms. He said he could still hear his father and a commotion downstairs.

Shawn testified that he heard the man with the bat alert the man with the gun, that the two men tried to find a way out of the house, and that he heard a bedroom window break. Shawn saw a police officer, and Philip Lim came upstairs. The police began searching the house and found the man with the bat and the man with the gun hiding in an upstairs bedroom. The police brought them out of the room and took off their bandanas. Shawn said that only one of the intruders was black, and he identified [the Petitioner] in court as the black intruder with the gun. Regarding an in-court identification of [co-defendant] Spencer, Shawn said that "it was dark in the living room . . . , so I'm not sure if he was the one that was in the living room or the one downstairs that I didn't see." He said that as a result of the attack, he had a large cut on his head that had to be closed with fifteen staples. He also had cuts and bruises on his body. He said he was in extreme pain, took pain medication, and stayed in bed for about one week. He said that the home invasion lasted about ten minutes and that he was "out of it" when he talked with the police.

On cross-examination, Shawn said he saw two men during the attack and "heard others." Shawn said that while the man with the bat and the man with the gun were upstairs with him, he could hear his father downstairs yelling "like he was still getting beaten."

The State recalled [co-defendant] Brandon Tarver, and his testimony resumed as follows: On the evening of August 8, 2007, [co-defendants] Tarver and Spencer drove [co-defendant] Spencer's dark green Toyota Camry to [co-defendant] Tarver's father's house on Apex Drive. [Co-defendant] Tarver called [the Petitioner] and told him to come over. [Co-defendant] Tarver said that [the Petitioner] knew about a house "where some guy lived that had some drugs and some money" and that they

decided to ride by the house to see if the man was home. [Co-defendant] Tarver, [the Petitioner], and [co-defendant] Spencer got into the Camry, and Tiffany drove them to Bradshaw Garden. They saw cars in the home's driveway, and [the Petitioner] told them the man was there.

[Co-defendant] Tarver said that Tiffany drove them back to his father's house and that he put a twenty-gauge Remington pump shotgun into the trunk of [co-defendant] Spencer's car. He said he could not remember if the shotgun was loaded and did not know at the time that a baseball bat also was in the trunk. Tiffany drove them back to Bradshaw Garden and parked at the end of the street. [Co-defendant] Tarver, [the Petitioner], and [co-defendant] Spencer got out of the car and walked to the Lim house. [Co-defendant] Tarver said that [co-defendant] Spencer was carrying the bat, that [the Petitioner] was carrying the gun, and that they had the weapons in order to scare the occupants of the house. When they arrived at the home, [co-defendant] Tarver kicked in the front door. [Co-defendant] Spencer walked into the house first, followed by [the Petitioner] and [co-defendant] Tarver, and confronted Philip Lim. Shawn Lim came up behind his father and threw [the Petitioner] onto the couch, and [co-defendant] Spencer hit Shawn with the bat. [Co-defendant] Spencer also hit Philip with the bat, and Philip started screaming. [Co-defendant] Tarver said his role was to find "the weed and the money," that he walked into a bedroom, and that he started searching "[t]o see what they had." He found a briefcase containing jewelry, and he put the jewelry in his pocket. He said that [the Petitioner] was in the living room and that he did not see [co-defendant] Spencer again.

[Co-defendant] Tarver testified that he heard Shawn Lim ask [the Petitioner] for permission to get a towel. He heard the home's front door open, and [the Petitioner] told him the police were there. [The Petitioner] used the end of the gun to break a window, and [co-defendant] Tarver saw police outside. He hid in a closet and [the Petitioner] hid under the bed, but the police found them. He acknowledged telling an investigator that he had realized as soon as they entered the Lim house that they had broken into the wrong home. He also acknowledged that they continued with their plan. Later, [co-defendant] Tarver took the police to [co-defendant] Spencer's house off Magnolia Avenue, but [co-defendant] Spencer was not there. [Co-defendant] Tarver used a police cellular telephone to call Tiffany, and she told him [co-defendant] Spencer was at [co-defendant] Tarver's father's house on Apex Drive. [Co-defendant] Tarver explained that he had stopped testifying earlier because "[t]hat's two of my best friends [sitting] over there." He said he pled guilty in this case in return for an eight-year

sentence. He acknowledged that no one in the district attorney's office had threatened him and that he did not have to testify.

On cross-examination, [co-defendant] Tarver testified that he and Tiffany had been dating and that he never told the police she was involved. He acknowledged that after he refused to testify earlier, he spoke with his attorney and that his attorney reminded him he was supposed to cooperate with the district attorney's office as part of his plea agreement. He said he decided to continue testifying because he would "get some more time" if he did not cooperate.

Heidi Lim testified that on the night of August 8, 2007, she was downstairs in her bedroom, which was next to Shawn's bedroom, and heard her father upstairs "yelling help, call 911." She grabbed a cordless telephone and went into Shawn's bedroom, but Shawn was not there. Heidi heard yelling upstairs, but she did not hear Shawn. She dialed 9-1-1 and got down on the floor, trying to hide. The State played Heidi's 911 call for the jury. During the call, which lasted about seven minutes, Heidi told the operator that someone was in her house and that she was hiding in her brother's bedroom. She also told the operator that she could hear someone saying "get on the ground" and that she thought her father had been hurt. Heidi testified that when the police arrived, she ran upstairs. Her father and brother were in the bathroom, and she saw Shawn holding a towel to his bleeding head. She said that her family owned a mixed-breed dog that stayed outside in a fenced yard, that she later found the dog hiding in a basement bathroom, and that his eye was bleeding.

Officer David Sanders of the Knoxville Police Department testified that on August 8, 2007, he responded to a home invasion call on Bradshaw Garden Drive. According to the call, a young woman was in the basement of the home, and the intruders were still in the house. Officer Sanders turned off his patrol car's lights and parked a couple of houses down from the Lim house. Officer Pete Franzen also arrived, and the two officers walked to the home. Officer Sanders set up a perimeter around the house while Officer Franzen went to the front of the house. Officer Sanders heard the front door slam. A few moments later, a window broke on the side of the house where he was standing. He watched the window, but no one climbed out. Other officers arrived, and Officer Sanders entered the basement through a broken sliding glass door. He checked each room in the basement to make sure no suspects were hiding and found Heidi Lim in a bedroom. He heard officers yelling upstairs, went upstairs, and saw officers taking a white male into custody. The officers were removing the

male from the bedroom where Officer Sanders had heard the window break earlier. Officers also took a young black male, who was hiding between the bedroom wall and the bed, into custody. A loaded shotgun was lying on the bed. Officer Sanders took the white male, who was [co-defendant] Tarver, outside; patted him down; and found jewelry in his pockets. He put [co-defendant] Tarver into his patrol car.

. . .

On cross-examination, Officer Sanders acknowledged that when he first arrived at the Lim home, he thought the suspects had a shotgun and a baseball bat. When officers arrested [the Petitioner], he was not wearing a bandana over his face. The bat found at the home on Apex Drive was wood, not aluminum, and Officer Sanders could not see any traces of blood on it.

Dan Crenshaw, a senior evidence technician for the Knoxville Police Department, testified that he confiscated the items found at the Apex Drive residence. Partial, but unidentifiable, fingerprints were on the bat and the shotgun. Crenshaw also checked the shotgun found at the Lim residence for fingerprints but did not find any identifiable prints.

Latonia Mills, [the Petitioner's] mother, testified for him that he was a good child and that she never had any problems with him as a juvenile. She said she did not know [co-defendants] Tarver or Spencer.

State v. Michael Deon Mills and Kenneth Allen Spencer, No. E2009-01708-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 303 at *2-15 (Tenn. Crim. App. Apr. 21, 2011), perm. app. denied (Tenn. July 14, 2011). The jury found the Petitioner guilty of especially aggravated kidnapping, especially aggravated robbery, and aggravated burglary. Id. at *15. The trial court sentenced the Petitioner to "twenty-five years to be served at one hundred percent in confinement for each of the Class A felony convictions and to six years as Range I, standard offender[] for the aggravated burglary conviction. The sentences were to run concurrently for effective sentences of twenty-five years." Id. This court affirmed the Petitioner's convictions on direct appeal, and our supreme court denied further review. Id. at 37.

*Post-Conviction Hearing*

The Petitioner filed a timely petition for post-conviction relief. At the post-conviction hearing, Latonya Mills testified that she was the Petitioner's mother and that the Petitioner has had ADHD since he was a child. Ms. Mills testified that ADHD affects

the Petitioner because "you can talk directly to him, but he is not understanding nothing [sic] that you say to him." Ms. Mills stated that she attended three or four meetings between the Petitioner and trial counsel and that trial counsel told the Petitioner that he would receive a fifteen-year sentence with twenty percent release eligibility. Further, Ms. Mills testified that trial counsel never discussed the potential sentence that the Petitioner could receive if he chose to proceed to trial and was found guilty.

On cross-examination, Ms. Mills testified that the Petitioner asked her to help him hire an attorney to represent him shortly after he was arrested for the underlying charges. Ms. Mills stated that she hired an attorney to represent the Petitioner during the preliminary hearing, and the attorney advised the Petitioner to accept a plea offer from the State for a twelve-year sentence with twenty percent release eligibility. Ms. Mills and the Petitioner were dissatisfied with this attorney's representation, so they hired trial counsel. On redirect examination, Ms. Mills stated that trial counsel never told the Petitioner that he might receive a sentence of twenty-five years with a one-hundred percent release eligibility.

The Petitioner testified that he has "been in special ed [sic] [his] whole life" and has difficulties speaking and writing. The Petitioner stated that he signed the plea agreement for twelve years with thirty percent release eligibility and was released on bond before giving a plea colloquy in criminal court. However, the Petitioner's father "felt like [the Petitioner] should get a second opinion from another attorney because he felt like it was too much time." When the Petitioner and his father met with trial counsel, she informed them that the plea offer of twelve years was not a good deal. The Petitioner testified that he did not accept the plea offer of twelve years because trial counsel advised him not to take it. The Petitioner stated that, if trial counsel had not advised against taking the plea offer of twelve years, he would have accepted the plea offer. The Petitioner testified that trial counsel never discussed his case with him and only called him to ask when he would be making a payment to her. The Petitioner stated that trial counsel never advised him that he could receive a sentence of twenty-five years with release eligibility after service of 100% of the sentence, and he was unaware that he could receive that sentence until he was sentenced. The Petitioner also stated that he "never wanted to go to trial" and that trial counsel never discussed proceeding to trial with him until two days before his trial.

The Petitioner testified that, at his meeting with trial counsel two days before trial, trial counsel told the Petitioner what he had been charged with but informed the Petitioner that "the kidnapping charges was [sic] going to get dismissed when [the Petitioner] go[t] to court" because the kidnapping was not a separate event from the robbery. The Petitioner stated that trial counsel advised him that if he was found guilty of the robbery charge then he could receive a maximum sentence of fifteen years with

thirty percent release eligibility. When the Petitioner arrived in court for his trial, trial counsel informed him that the State had withdrawn the previous plea offer. Additionally, the Petitioner testified that trial counsel never discussed requesting a jury instruction on accomplice testimony with him, and trial counsel did not provide the Petitioner with his discovery materials.

Trial counsel testified that she had practiced law in Tennessee since 1993 and that part of her practice included criminal defense. Trial counsel stated that, after the Petitioner and his family terminated their representation with Mr. Whalen, she agreed to represent the Petitioner. At that point, trial counsel learned that the State had offered the Petitioner a plea offer for a twelve-year sentence with thirty percent release eligibility, but the Petitioner did not want to plead guilty. Trial counsel informed the Petitioner that his only options were to accept a plea offer or proceed to trial, but trial counsel testified that the Petitioner was "adamant" about not pleading guilty. Trial counsel stated that she "wasn't even authorized to do any negotiations for [the Petitioner] because he said he was not going to plea." Trial counsel testified that after she was retained and the Petitioner was arraigned she looked at the Petitioner's general sessions warrants to determine the Petitioner's charges. Trial counsel stated that she "did legal research" to determine the sentencing ranges for the Petitioner's charges. Trial counsel informed the Petitioner that he could receive a sentence between fifteen and twenty-five years with one-hundred percent release eligibility for the especially aggravated robbery charge. Trial counsel stated that either the Petitioner's mother or father or both were present when she met with the Petitioner to explain the possible sentences. Trial counsel stated that she "never promised [the Petitioner] anything." Because the Petitioner informed trial counsel that he did not want to plead guilty and wanted to proceed to trial, trial counsel prepared for trial.

On cross-examination, trial counsel stated that she did not discuss with the Petitioner the possibility of pleading guilty to the robbery charge and proceeding to trial on the kidnapping charge because the Petitioner "did not want to plea at all." The following exchange occurred between trial counsel and the Petitioner's post-conviction counsel:

Q (Post-conviction counsel): Why didn't you request an accomplice jury instruction?

A (trial counsel): An accomplice? Because [the Petitioner] was found in the house. And I represented him.

Q: Was [co-defendant] Brandon Tarver an accomplice?

…

A: He was perhaps an accomplice, yes.

The post-conviction court found that trial counsel "acknowledged that [co-defendant] Tarver could be considered an accomplice and agreed that she did not request a jury instruction on accomplice testimony." The post-conviction court found that the circumstances of the case "provided adequate corroboration" of [co-defendant] Tarver's testimony and therefore an instruction on accomplice testimony was not necessary. The post-conviction court found that the Petitioner had failed to prove by clear and convincing evidence that trial counsel's failure to request the instruction had prejudiced him and denied relief to the Petitioner on this issue.

The post-conviction court found trial counsel's testimony regarding her meetings with the Petitioner and the depth of her discussion with him regarding plea offers and potential sentences credible. The post-conviction court also found that the Petitioner had failed to prove by clear and convincing evidence that "trial counsel was deficient at all with respect to communication with her client, trial preparation or plea bargaining[]" and denied relief to the Petitioner on this ground, as well. This timely appeal followed.

## II. Analysis

On appeal, the Petitioner argues that trial counsel was ineffective in failing to advise him about the potential consequences of proceeding to trial; specifically, the Petitioner argues trial counsel was ineffective by informing him that the kidnapping charge would be dismissed and by telling him that the maximum sentence he could receive was fifteen years with thirty percent release eligibility. The Petitioner also contends that trial counsel was ineffective in failing to request a jury instruction on accomplice testimony and that "[h]e was prejudiced by the jury never knowing that [co-defendant] . . . Tarver's testimony must be corroborated." The Petitioner asserts trial counsel's failure to request and the trial court's failure to issue a jury instruction on accomplice testimony constitutes reversible error and deprived the Petitioner of due process. The State responds that trial counsel's performance regarding communications with the Petitioner was not deficient and that the Petitioner has not shown that he was prejudiced by trial counsel's advice or her failure to request a jury instruction on accomplice testimony.

*Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828,

830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing

- 11 -

professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

### Failure to Communicate Potential Results of Trial

In support of his argument, the Petitioner testified that he would have accepted the State's plea offer of a twelve-year sentence with thirty percent release eligibility if trial counsel had not advised against accepting the offer. The Petitioner also stated that trial counsel never advised him that he could receive a twenty-five year sentence with release eligibility after service of 100% of the sentence if he proceeded to trial. Trial counsel testified that the Petitioner "adamantly" told her that he did not want to plead guilty and that the Petitioner did not authorize her to negotiate with the State for a plea offer. Trial counsel also testified that she informed the Petitioner of all the possible sentencing ranges for the crimes that he was charged with committing. In particular, trial counsel testified that she informed the Petitioner that he could receive a sentence between fifteen and twenty-five years with release eligibility after service of 100% of the sentence. The post-conviction court found trial counsel to be credible and found that the Petitioner had failed to prove by clear and convincing evidence that "trial counsel was deficient at all with respect to communication with her client, trial preparation or plea bargaining." The evidence in the record does not preponderate against the post-conviction court's findings. Therefore, we conclude that the Petitioner has failed to establish that trial counsel was deficient in failing to communicate to him the possible consequences of proceeding to trial. The Petitioner is not entitled to relief on this ground.

### Failure to Request Accomplice Jury Instruction

In support of his argument that trial counsel was ineffective for failing to request a jury instruction on accomplice testimony, the Petitioner testified that trial counsel never discussed requesting a jury instruction on accomplice testimony with him. Trial counsel testified that she did not request a jury instruction on accomplice testimony because "[the Petitioner] was found in the house[,]" but trial counsel stated that co-defendant Tarver "was perhaps an accomplice." The post-conviction court found that the circumstances of the case "provided adequate corroboration" of co-defendant Tarver's testimony, and

- 12 -

therefore, an instruction on accomplice testimony was not necessary. The post-conviction court further found that the Petitioner had failed to prove by clear and convincing evidence that trial counsel's failure to request the instruction had prejudiced him.

The evidence shows that trial counsel was deficient in failing to request an accomplice testimony jury instruction. "If the facts about the witness' participation in the crime are clear and undisputed, the trial court should determine as a matter of law whether the witness was an accomplice." State v. Robinson, 239 S.W.3d 211, 225 (Tenn. Crim. App. 2006) (citing State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997)). "However, if the facts are disputed or subject to different inferences, the jury should determine as a question of fact whether the witness was an accomplice." Id. (citing State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997)). Here, the facts regarding co-defendant Tarver's participation in the crime are clear and undisputed. Additionally, the post-conviction court found that trial counsel acknowledged that co-defendant Tarver was an accomplice. Therefore, trial counsel should have requested that the trial court determine as a matter of law whether co-defendant Tarver was an accomplice and that the trial court instruct the jury on accomplice testimony. See Ronnell Leberry v. State, No. M2007-01813-CCA-R3-PC, 2009 WL 112579, at *5 (Tenn. Crim. App. Jan, 14, 2009) (counsel was deficient in failing to request jury instruction on accomplice testimony when the proof at trial established that a witness was an accomplice), perm. app. denied (Tenn. June 15, 2009); see also George Arthur Lee Smith v. State, No. E2010-00488-CCA-R3-PC, 2012 WL 260022, at *24 (Tenn. Crim. App. Jan. 30, 2012) (holding that trial counsel was deficient in failing to request a jury instruction on accomplice testimony), perm. app. denied (Tenn. June 25, 2012). However, the Petitioner is not entitled to relief because he failed to establish that he was prejudiced by trial counsel's failure to request a jury instruction on accomplice testimony.

We agree with the post-conviction court that the Petitioner has failed to establish prejudice. The police officers found the Petitioner hiding in the victims' house when they apprehended him. Additionally, the victims identified the Petitioner as one of their assailants. The Petitioner has not established on appeal how a jury instruction on accomplice testimony would have affected his trial, besides alleging that he was prejudiced because the jury did not know that co-defendant Tarver's testimony should have been corroborated. The Petitioner has failed to prove that he was prejudiced by trial counsel's failure to request a jury instruction on accomplice testimony. See Chico Lopez Chigano v. State, No. 03C01-9602-CR-00061, 1997 WL 105002, at *2 (Tenn. Crim. App. Mar. 11, 1997) ("[I]n order for the appellant to prevail in this collateral attack, the proof must establish that had the questioned accomplice instruction been given to the jury, there is a 'reasonable probability' that the appellant would have been acquitted[]"),

perm. app. denied (Tenn. June 30, 1997). The Petitioner is not entitled to relief on this ground.

Additionally, the Petitioner argues that trial counsel's failure to request a jury instruction on accomplice testimony and the trial court's failure to instruct the jury on accomplice testimony deprived him of due process and constituted reversible error. Under the Post-Conviction Procedure Act:

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless: (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code Ann. § 40-30-106(g); see Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004); Black v. State, 794 S.W.2d 752, 756 (Tenn. Crim. App. 1990). In his petition for post-conviction relief, as amended, the Petitioner did not allege that trial counsel's failure to request a jury instruction and the trial court's failure to instruct the jury on accomplice testimony deprived him of his due process rights under the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I Section 8 of the Tennessee Constitution and constituted reversible error. The Petitioner's claim for relief on this ground is not based upon "a constitutional right not recognized as existing at the time of trial," and the Petitioner does not allege that his failure to present this ground for relief was the result of state action. Therefore, this issue is waived.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 14 -